1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
2                    COLUMBUS DIVISION

3

4     UNITED STATES OF AMERICA ex rel.,  )
      STATE OF GEORGIA ex rel.,          )
5                                        )
      RICHARD BARKER,                    )
6                                        )
                   Plaintiffs,           )
7                                        )
      vs.                                )  CIVIL CASE NO.
8                                        )  4:12-CV-108 (CDL)
                                         )
9     COLUMBUS REGIONAL HEALTHCARE       )
      SYSTEM, THE MEDICAL CENTER, JOHN   )
10    B. AMOS CANCER CENTER, REGIONAL    )
      ONCOLOGY, LLC, THOMAS J. TIDWELL,  )
11    M.D. and COLUMBUS RADIATION        )
      ONCOLOGY TREATMENT CENTER,         )
12                                       )
                   Defendants.           )
13

14

15

16         Transcript of motion to compel hearing before the

17    Honorable Clay D. Land, Judge of the United States District

18    Court for the Middle District of Georgia, held at the United

19    States District Courthouse for the Middle District of Georgia,

20    Columbus, Georgia, on the 20th day of August, 2014, commencing

21    at 10:07 a.m.

22

23

24

25

1                          <u>APPEARANCES</u>

2    On behalf of the Plaintiffs:

3                      MS. JAMIE M. BENNETT
                       MR. NATHAN M. PEAK
4                        Ashcraft & Gerel
                         Attorneys at Law
5                 Metro 400 Building, Suite 301
                     4301 Garden City Drive
6                   Landover, Maryland 20785
                       (301) 459-8400
7                  jbennett@ashcraftlaw.com
                    npeak@ashcraftlaw.com
8

9       On behalf of the Defendant Columbus Regional:

10                   MR. L. JOSEPH LOVELAND
                     MR. MICHAEL E. PAULHUS
11                      King & Spalding
                        Attorneys at Law
12                 1180 Peachtree Street, N.E.
                   Atlanta, Georgia  30309-3521
13                     (404) 572-2860
                    jloveland@kslaw.com
14                   mpaulhus@kslaw.com

15                   MR. JEFFREY A. BROWN
                        Brown & Adams
16                      Attorneys at Law
                The Rothschild Building, Suite 400
17                 1214 First Avenue  31901
                     Post Office Box 139
18                 Columbus, Georgia  31902
                       (706) 653-6109
19                 jbrown@brownadamsllc.com

20

21

22

23

24

25

1                On behalf of the Defendant Tidwell:

2                     MR. TRAVIS C. HARGROVE
              Page, Scrantom, Sprouse, Tucker & Ford
3                       Attorneys at Law
                  Synovus Centre, Third Floor
4                  1111 Bay Avenue  31901
                    Post Office Box 1199
5                  Columbus, Georgia  31902
                       (706) 324-0251
6                    tch@pssft.com

7

8

9   Court Reporter:  Alan M. Causey, CCR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Court in session at 10:07 a.m.)

2              THE COURT:  Good morning.

3          (Collective good morning from the parties)

4              THE COURT:  Madam Clerk, call the first case — our

5      only case this morning.

6              THE CLERK:  Richard Barker on behalf of the United

7      States of America and the State of Georgia versus Columbus

8      Regional Healthcare Systems, Inc., et al, Case Number

9      4:12-CV-108.

10             THE COURT:  Okay.  Let's first identify on the record

11     who is present on behalf of the various parties.

12             MS. BENNETT:  Your Honor, I'm Jamie Bennett.  I

13     represent Mr. Barker, the relator plaintiff in this matter.

14             THE COURT:  Okay.  Welcome.

15             MR. PEAK:  Good morning, Your Honor.  Nathan Peak,

16     also on behalf of Mr. Barker, the relator plaintiff.

17             THE COURT:  All right.  Welcome.

18             MR. PAULHUS:  Good morning, Your Honor.  Michael

19     Paulhus.  I represent the Columbus Regional defendants —

20     that's all the defendants with the exception of Dr. Tidwell.

21             THE COURT:  Okay.  Columbus Regional.

22             Okay.

23             MR. BROWN:  Good morning, Your Honor.  Jeff Brown,

24     for the Columbus Regional defendants.

25             THE COURT:  All right.

```
 1              MR. LOVELAND:  Good morning, Your Honor.  Joe
 2    Loveland, also Columbus Regional defendants.
 3              THE COURT:  Okay.  Welcome to all of you.
 4              MR. LOVELAND:  Thank you, Your Honor.
 5              MR. HARGROVE:  Your Honor, Travis Hargrove, here on
 6    behalf of Dr. Tidwell; although, we're not a party to the
 7    motion.
 8              THE COURT:  Okay.  Mr. Hargrove.
 9              Is that everybody?
10              Okay, as everybody knows, I scheduled this hearing or
11    oral argument on the plaintiffs' motion to compel materials
12    that are arguably protected by the attorney-client privilege,
13    that the plaintiffs maintain that the privilege has been
14    impliedly waived by defendants' position in this case, that
15    they have complied with the law.
16              And I am —— I've read the briefs and studied the
17    issues.  I'm going to clarify some things this morning to make
18    sure that I make the right decision or the best decision in
19    this case, but also because the decision on this issue is going
20    to have far-reaching implications in my court —— in the cases
21    that are pending in my court beyond just this case.  And I just
22    want to make sure that I have —— that I understand all of the
23    arguments and the consequences of such a decision, whatever it
24    may be.
25              So I guess the first thing I want to nail down from
```

```
 1    the plaintiffs' perspective is I want to make sure that I fully
 2    understand the exact claims to which this motion applies.  As I
 3    read the briefs and the motion, I understand we're talking
 4    about the claim that the Tidwell transaction violates the Anti-
 5    Kickback Statute and the Stark law and the claim that the
 6    compensation arrangement between Columbus Regional and
 7    Radiation Oncology of Columbus violates the Anti-Kickback
 8    Statute and Stark law.
 9            Are those the claims to which this motion to compel
10    relates, Ms. Bennett?
11            MS. BENNETT:  Your Honor, would the Court like me to
12    go to the podium?
13            THE COURT:  You can stay there if you wish, but just
14    make sure you speak into that microphone and -- so that we
15    can -- I can hear you and we can get it on the record.
16            MS. BENNETT:  Yes, Your Honor.
17            Your Honor, I think that the Court has posed a very
18    important question and one that I have as well.  In terms of
19    what is before the Court at present, our primary focus has been
20    on the defendants' claims that the relationship with
21    Dr. Tidwell and with Regional Oncology of Columbus are in
22    compliance with the Anti-Kickback Statute and Stark.  And
23    that's the way the issue surfaced to the parties and that's the
24    way the issue surfaced to the Court.
25            But I do have similarly questions about what a
```

1   defendant — the scope of the defense that — the good faith

2   defense that the defendant has offered.  And I would take the

3   position that any defense that the defendant proffers to the

4   jury that includes an argument that they complied in good faith

5   with the law, whether it be these compensation relationships or

6   other allegations in the complaint — such as the upcoding

7   allegation or the allegation that they billed improperly for —

8           THE COURT:  So your position is that you are seeking

9   any materials that relate to any advice that counsel may have

10  given regarding the legality of any of these transactions that

11  form the basis of your False Claims Act case?

12          MS. BENNETT:  Yes, Your Honor, if —

13          THE COURT:  Okay.

14          MS. BENNETT:  — that defense is based on a good

15  faith belief and compliance —

16          THE COURT:  All right.

17          MS. BENNETT:  — with the law.

18          And one of the — one of the reasons why I'm happy

19  that the Court set this hearing is that I do agree that this is

20  a really important issue.  It's important for the relator.

21  It's important for the defendant.  And we need to really hammer

22  out today —

23          THE COURT:  Are you aware of any decisions in any

24  other False Claims Act cases other than the one — was the one

25  in the Northern District a False Claims Act case?

1          MS. BENNETT:  Yes, Your Honor.

2          THE COURT:  Are you aware of any other decisions on

3    this issue of waiver of attorney-client privilege where the

4    defendant raises a defense that they in good faith thought they

5    followed the law?

6          MS. BENNETT:  Your Honor, I would say as an officer

7    of the Court that there are other decisions.  I'm not in a

8    position today to rattle them off on my fingertips.  But if the

9    Court wants —

10          THE COURT:  Are they included in your briefing?

11          MS. BENNETT:  No, I don't think we included them in

12    the briefing.  We —

13          THE COURT:  Were they against you?

14          MS. BENNETT:  No, Your Honor.  No.  I have never —

15          THE COURT:  Why would you not include — why would

16    you not have included False Claims Act cases in your briefing

17    that held that the attorney-client privilege was impliedly

18    waived when the defendant took the position that they in good

19    faith followed the law?

20          MS. BENNETT:  Our focus in briefing this issue has

21    been very much on the 11th Circuit law, which we feel is —

22          THE COURT:  You like *Cox*.

23          MS. BENNETT:  — perfectly clear — I like *Cox*.

24          THE COURT:  Yeah, I'm sure you — I'm sure you do.

25          MS. BENNETT:  But also I feel that that's the most

 1    pertinent guidance for your ——

 2             THE COURT:  I understand.  We're going to get to *Cox*

 3    in a movement.

 4             Are you aware of any 11th Circuit cases that —— I'm

 5    assuming not —— that take a position that you think is

 6    inconsistent with *Cox*?

 7             MS. BENNETT:  I know of no cases.  And I would add to

 8    that by saying that the courts —— the district courts in the

 9    11th Circuit appear to apply *Cox's* holding very broadly

10    across ——

11             THE COURT:  There are other district court opinions

12    that follow *Cox* in the False Claims Act setting?

13             MS. BENNETT:  Not in the Claims —— False Claims Act

14    setting, no.

15             THE COURT:  Okay.  Well, that's what I was asking

16    about.

17             MS. BENNETT:  Right.  But, I mean, in other —— in ——

18             THE COURT:  Outside of the 11th Circuit?

19             MS. BENNETT:  —— analogous circumstances.

20             THE COURT:  Oh, in analogous circumstances.  Okay.

21             But you're aware of no other district court decision

22    in the 11th Circuit that follows *Cox* in the False Claims Act

23    setting; is that correct?

24             MS. BENNETT:  That's correct, Your Honor.

25             But what I would proffer is that the —— the district

1   courts in the 11th Circuit have followed it in many other

2   cases — employment cases, for example — where the defendant

3   is raising a good faith compliance with the law to —

4           THE COURT:  Has the 11th Circuit ever held that?

5           MS. BENNETT:  In the False Claims Act arena?

6           THE COURT:  No, no.  In the employment setting.

7           MS. BENNETT:  I don't think so.  I think that one of

8   these cases went up on appeal —

9           THE COURT:  Well, let me just explore that with you.

10  This is a little out of the order I was going to talk to you

11  about things, but since you raised that issue.  And it relates

12  to the implications of how the Court would rule today.

13          If I were to rule — if I were to hold that *Cox*

14  stands for the proposition that whenever a defendant takes the

15  position that they have in good faith complied with the law,

16  that that always impliedly waives the attorney-client

17  privilege, such that the plaintiff may then depose attorneys

18  and find information about what they told their client as to

19  their compliance with the law, then this would extend well-

20  beyond just False Claims Act cases.  It would extend to Title

21  7, where a defendant takes the position that we, in good faith,

22  believe that we complied with EEOC regulations.  It would mean

23  that if an employer took that position — and even if they did

24  not say we were relying on counsel, that that has nothing to do

25  with it, we just thought we were in good faith complying with

1    the EEOC regulations — under *Cox* and under your interpretation
2    of *Cox,* it would mean that that employment lawyer for the
3    plaintiff would be able to depose lawyers in the legal
4    department about any seminars that they provided to their
5    supervisors as to what was appropriate and compliant conduct.
6    It would just open the door to that type of discovery of
7    attorney-client information.
8               But I guess that's your position as — that's what
9    *Cox* means?
10              MS. BENNETT:  That's what *Cox* means, Your Honor.
11              THE COURT:  And similarly, if — if a plaintiff were
12   to file a claim for punitive damages and the defendant had a
13   defense that we, in good faith, thought we were following the
14   employment law or the other — or any other federal law, and,
15   therefore, we should not be subject to punitive damages, if
16   they took that position — even if they did not say, "We talked
17   with our lawyers, and they told us it was okay" — if they just
18   said, "We complied — we thought we were complying with the
19   law," it would be your position that the plaintiff in that case
20   would be allowed to depose lawyers who provided any kind of
21   advice about whether they were complying with the law
22   beforehand?
23              MS. BENNETT:  Yes, Your Honor.
24              THE COURT:  That's the way you read *Cox?*
25              MS. BENNETT:  I think that is what *Cox* says on —

```
 1              THE COURT:  Are there any other —— but there are no
 2    11th Circuit cases —— are there any 11th Circuit cases that
 3    apply Cox?
 4              When I say 11th Circuit, I mean the Court of Appeals.
 5              MS. BENNETT:  Uh-huh.
 6              THE COURT:  That apply Cox to any other situation,
 7    other than this one case that —— the one union case that —— the
 8    Cox case?
 9              Other than that, has there been any subsequent
10    reliance upon Cox —— that aspect of Cox —— the attorney-client
11    holding in Cox —— in any other Court of Appeals case in the
12    11th Circuit since Cox was decided in 1996, or whenever it was?
13              MS. BENNETT:  No, Your Honor, I don't know of any.
14    The only other case I would refer the Court to is I believe the
15    Carpenter case.  When the district court waived the attorney-
16    client privilege, the defendant attempted to have an
17    interlocutory —— either an interlocutory appeal or a mandamus.
18    And the 11th Circuit denied it, saying this is within the
19    discretion of the district court and it's not subject to
20    mandamus.
21              But the ——
22              THE COURT:  So the 11th Circuit has —— Cox was
23    decided in —— what, 1996?
24              MS. BENNETT:  Yes, Your Honor.
25              THE COURT:  Of course ——
```

1             MS. BENNETT:  1994.  Sorry.

2             THE COURT:  '94.  So 20 years ago.

3             MS. BENNETT:  (Nods head affirmatively)

4             THE COURT:  Of course, it was written by then almost

5    brand-new Judge Carnes, who is now our chief judge.

6             And you're telling me that in 20 years the

7    proposition in *Cox* relating to attorney-client — waiver of

8    attorney-client privilege has never been cited again by the

9    11th Circuit Court of Appeals?

10            MS. BENNETT:  I'm not aware of any cases in which the

11   court has addressed it.  The proposition for which it stands is

12   fairly well-settled law.  It's applied very widely —

13            THE COURT:  Well-settled — I guess you mean that the

14   district courts —

15            MS. BENNETT:  Yes, Your Honor.

16            THE COURT:  — have either applied the principle as

17   you seek for it to be applied and there's either — been no

18   appeal of it because everybody agrees that it's so well-

19   settled.

20            MS. BENNETT:  It is very well-settled law in the 11th

21   Circuit —

22            THE COURT:  Or could it —

23            MS. BENNETT:  — and in many other circuits.

24            THE COURT:  Or could it be that when those issues

25   that are decided in the district court there's no meaningful

1    opportunity for that to be appealed because it's an

2    interlocutory appeal that can only I guess be heard at the

3    discretion of the Court of Appeals.

4           We just don't know why the Court of Appeals has not

5    addressed it since.

6           MS. BENNETT:  Of course, it could be appealed at the

7    end of the case when there's ——

8           THE COURT:  Okay.

9           MS. BENNETT:  —— a final judgment against the

10   defendant.

11          But my view of this, Your Honor, is that the

12   proposition for which *Cox* stands is very uncontroversial.  It's

13   accepted in almost every other circuit court except perhaps the

14   3rd Circuit.

15          THE COURT:  Well, it may or it may not be

16   uncontroversial, but I —— I have dealt, in my 13 years or so,

17   with several cases in which there are good faith defenses

18   available and are asserted in various contexts.

19          And I think this is the first time —— and maybe it's

20   just because you're an outstanding lawyer.  I think this is the

21   first time that I recall anybody suggesting that attorney-

22   client —— that a client has waived the attorney-client

23   privilege simply because the defendant took the position that I

24   thought in good faith I was following the law.

25          So I'm going to follow *Cox,* however I interpret *Cox.*

 1                MS. BENNETT:  Yes, sir.

 2                THE COURT:  But I understand it's binding precedent,

 3    and I don't want to suggest otherwise.  But for it to be so

 4    well-settled, the principle has apparently not been the subject

 5    of any lawyers' seminars out there, this is how you can get

 6    some good attorney-client material, because at least in this

 7    court people aren't raising it.

 8                I mean, I guess you raise it routinely?

 9                MS. BENNETT:  Yes, Your Honor, we do raise it

10    routinely.

11                THE COURT:  Okay.  Let me ask you a few more specific

12    questions.

13                In order for you to prevail on your claims, am I

14    correct that you have got to prove that the defendants

15    knowingly violated -- let's just take the anti-kickback

16    claims -- that they knowingly violated the Anti-Kickback

17    Statute with the intent of violating it?

18                Do you have to prove that in your *prima facie* case?

19    Is that one element of your case?

20                MS. BENNETT:  The False Claims Act requires the

21    relator plaintiff to prove that the defendant knowingly

22    submitted false claims to the United States.  And "knowingly"

23    is defined to include actual knowledge of the falsity of the

24    statement and acting in reckless disregard of the truth or

25    falsity of the statement.  That's how --

1              THE COURT:  Okay.

2              MS. BENNETT:  —— is defined.

3              THE COURT:  So when they submitted a claim —— when

4    Columbus Regional submitted a claim to be reimbursed for a

5    procedure, they were certifying that they had complied with the

6    Anti-Kickback Statute and the *Stark* law; correct?

7              MS. BENNETT:  Yes, Your Honor.

8              THE COURT:  In order for you to prevail, you've got

9    to prove, number one, that that was false, that they did not

10   comply with the Anti-Kickback Statute or the *Stark* law;

11   correct?

12             MS. BENNETT:  Yes, sir.

13             THE COURT:  And you've got to prove that they knew

14   that was false or that they had a reckless disregard for the

15   truth of that statement?

16             MS. BENNETT:  Exactly, Your Honor.

17             THE COURT:  Okay.  And that's your burden?  You've

18   got to prove those things?

19             MS. BENNETT:  Yes, Your Honor.

20             THE COURT:  So if a defendant comes in and their

21   defense is, "We were not aware that we were not complying with

22   the Anti-Kickback Statute," that would be a valid defense to

23   the claim?

24             MS. BENNETT:  Yes, Your Honor.

25             THE COURT:  Okay.  And it's your position —— is it

1    your position –– let's forget about affirmative defenses and

2    all that language.

3         Is it your position that if a defendant in defending

4    the claim says, "No, we deny your allegation, we deny that we

5    knew that what we did violated the Anti-Kickback Statute," is

6    it your position that *Cox* would then allow you to obtain

7    attorney-client materials in order to prove that they were told

8    beforehand by their attorney that this was unlawful?

9         MS. BENNETT:  Your Honor, if I could ––

10        THE COURT:  Well, answer that question first, and

11   then I'll let you explain.

12        MS. BENNETT:  Yes.  I just wanted to make sure I

13   understood it by ––

14        THE COURT:  Okay.

15        MS. BENNETT:  –– by repeating back to what ––

16        THE COURT:  Okay.

17        MS. BENNETT:  –– to you.

18        So what I understand the Court to be saying is that

19   if the defendant comes into court facing this kind of claim and

20   they say, "We did not intend to defraud the government."

21        Is that ––

22        THE COURT:  Well, I don't –– I don't know that a

23   defendant knows all that.  I'm just saying the defendant comes

24   in –– I mean, they will with sophisticated lawyers.  But I'm

25   just saying the defendant comes in and says, "We didn't know

1   this was against the law."

2           MS. BENNETT:  Then in that case we didn't know —

3           THE COURT:  And let's assume that that wasn't

4   reckless disregard.  Let's just assume they came in and said,

5   "You know, I'm — we didn't know it was against the law.  We've

6   been in the health care industry, and we thought this was

7   appropriate."  That's what they say.

8           MS. BENNETT:  Well, that's — and therein lies the

9   rub.  The devil's in the details.

10          THE COURT:  There you go.  That's the problem with

11  *Cox,* if there's a problem with *Cox.*  But I'm going to get to

12  that in a minute.

13          What if the defendant just says, We didn't know?

14          MS. BENNETT:  We didn't know the law existed, for

15  example?

16          Then, no, I don't —

17          THE COURT:  We didn't — we just didn't know it was

18  against the law?

19          MS. BENNETT:  Then I don't think I would be entitled

20  to obtain their attorney-client privilege documents.  It's only

21  when —

22          THE COURT:  Okay.  All right.  Okay.

23          Now, what if the defendant comes in and says, "I

24  should not be held legally responsible because I had a good

25  faith belief that I was not violating the law"?

```
 1              MS. BENNETT:  That's when we get the attorney—client
 2    privilege ——
 3              THE COURT:  So in that case you get it?
 4              MS. BENNETT:  Yeah.
 5              THE COURT:  Now, how does that —— explain to me
 6    how —— I mean, a defendant comes in —— and you say you get it
 7    just because Cox says you get it or do you say you get it
 8    because it makes sense ——
 9              MS. BENNETT:  Your Honor ——
10              THE COURT:  —— the distinct —— explain the
11    distinction to me, because that's not clearly explained in Cox.
12              Explain to me how a defendant can come in and say,
13    "We think —— we thought we followed the law and it" —— or "we
14    thought that what we did was not against the law," and in that
15    circumstance you can't get attorney—client privileged
16    information.  But if he comes in and his lawyer puts fancy
17    words on it and says, "We had a good faith belief that we were
18    following the law," and then you can get attorney—client
19    information.
20              Explain, first of all, how Cox explains that
21    distinction.  And then explain to me how you explain it.
22              MS. BENNETT:  Yes, Your Honor.  And I think that we
23    need to really be precise about what the defense is that's
24    being offered.  And that ——
25              THE COURT:  Well, we're going to get to that in a
```

1    minute, but this background helps me understand that issue.  I

2    just want to — I want to make sure I — if I'm going to put an

3    order out, I want to make sure that I can explain this

4    distinction.

5              MS. BENNETT:  Yes, Your Honor.

6              THE COURT:  Because if I can't, it's troublesome to

7    me.  So you — so I want you to help me.  The briefing didn't

8    help me that much.  The briefing just indicated to me that this

9    was troublesome.  So I want you to help me — I want you to

10   help me understand the distinction there.

11             MS. BENNETT:  Your Honor —

12             THE COURT:  Understanding that what we're talking

13   about is the waiver of perhaps one of the oldest privileges

14   under the law, and that's the attorney—client privilege.  And

15   the question is, are we really going to find that privilege to

16   be waived based on the words that are used, the semantics of

17   the situation?

18             MS. BENNETT:  That's exactly —

19             THE COURT:  So please explain the distinction.

20             MS. BENNETT:  Yes, Your Honor, that's exactly what

21   *Cox* did.  And the difference is —

22             THE COURT:  What is exactly what *Cox* did?

23             MS. BENNETT:  *Cox* —

24             THE COURT:  Based it on the semantics?

25             MS. BENNETT:  No.  The Court said that when a

1  party — a defendant asserts a defense, that any action by the

2  defendants are taken — undertaken in good faith and constitute

3  lawful, proper and are privileged conduct, that that is a

4  matter of fairness, requires the waiver of the attorney-client

5  privilege to allow the opposing party to examine any documents

6  that might reflect the fact that the defendant had actually

7  known or been told by its attorney —

8              THE COURT:  Okay, that's fine.

9              But what if the defendant says, "We thought we were

10 following the law"?  Why wouldn't it not be equally fair to be

11 able to find out whether that lawyer, in fact, beforehand told

12 those folks that this was against the law or not?  Why would —

13 that — that's what I'm trying to understand.  Why is one

14 unfair not to let them get it and one's fair to let them get

15 it?

16             MS. BENNETT:  Your Honor, your original hypothesis —

17 or your original question to me was what if the defendant just

18 comes in and says, "I didn't know about the law," and now —

19             THE COURT:  No, no.  No, no.  My — you misunderstood

20 my hypothesis.  So let's go back and straighten that out.

21             My hypothesis was — is, what if the defendant comes

22 in and just says, "We thought what we were doing was not

23 against the law"?

24             MS. BENNETT:  That's exactly the situation in *Cox.*

25             THE COURT:  Okay.

1          MS. BENNETT:  Yes.

2          THE COURT:  So —

3          MS. BENNETT:  You're invoking the law, and that

4    raises — that immediately raises a fairness question to the

5    plaintiff relator.

6          THE COURT:  So you think any time — so the plaintiff

7    has got to prove that they knowingly violated the law?

8          MS. BENNETT:  Yes.

9          THE COURT:  And if a defendant comes in and says, "We

10   did not think we were violating the law," that in your view

11   invokes *Cox* such that you can get attorney-client materials?

12         MS. BENNETT:  Again, Your Honor, I think the

13   situation — I thought the situation that we were talking about

14   is when the defendant comes in and says, "We understood at all

15   times that our behavior was in compliance with the law," or "we

16   had a good faith belief at all times that our behavior or

17   conduct was in" —

18         THE COURT:  You see that as —

19         MS. BENNETT:  — "compliance with the law."

20         THE COURT:  — different than them saying —

21         MS. BENNETT:  "I didn't know about the law."

22         THE COURT:  No.

23         You see that as different from saying, "We didn't

24   think we were violating the law"?

25         MS. BENNETT:  No, Your Honor.  I only —

1           THE COURT:  You think that's —— you think if they

2  say, "We don't —— we didn't think we were violating the law" is

3  the same thing as we had a good faith belief that we were

4  following the law?

5           MS. BENNETT:  Exactly.

6           THE COURT:  In both of those cases *Cox* would allow

7  you to get the materials?

8           MS. BENNETT:  Exactly.

9           THE COURT:  But if the defendant comes in and says,

10  "We had no idea what the law was, and so we did not knowingly

11  violate the law," then *Cox* would not be implicated, unless it

12  was a reckless ——

13           MS. BENNETT:  Yes.

14           THE COURT:  —— disregard?

15           MS. BENNETT:  Yes.  Then it would be reckless

16  disregard.  I think for a sophisticated health care entity to

17  come in and say they didn't even know the law existed —— I've

18  already had that happen —— I think that would be a different

19  situation.  So ——

20           THE COURT:  So from your perspective and from *Cox's*

21  perspective —— well, see, that's what I'm not understanding

22  under *Cox*.  Because *Cox* seemed to suggest that if the defendant

23  came in and denied an essential element of the claim, the

24  intent element —— if the defendant just came in and denied that

25  element and said, "We did not think we were violating the law,"

1  and, therefore, there was no intent to violate the law.

2          *Cox* seems to say that under that circumstance there

3  would be no implied waiver.  But there's only an implied waiver

4  if they make the affirmative statement that there was a good

5  faith belief that they were following the law.

6          Isn't that what — isn't that what Judge Carnes said

7  in *Cox*?

8          MS. BENNETT:  So what —

9          THE COURT:  Didn't he make a distinction between a

10  denial of intent and taking some affirmative step that there

11  was a good faith belief that they were following the law?

12          MS. BENNETT:  Your Honor, what the — distinction

13  that the 11th Circuit made in *Cox* is between a denial of the —

14  a simple denial of the elements of the offense, "We didn't act

15  knowingly, we didn't act with intent to defraud," or maybe "we

16  didn't do these factual things that you're saying we did," then

17  you don't get the attorney-client privilege.  But any defense

18  that goes beyond that, where the defendant injects into the

19  proceeding an issue that goes beyond a simple denial of the

20  allegations in the complaint —

21          THE COURT:  Well, if you denied the — if you deny

22  intent, how are you not injecting into the case that you didn't

23  think you were violating the law?

24          MS. BENNETT:  Can I give the Court an example of how

25  I see this playing out —

1          THE COURT:  Yes.

2          MS. BENNETT:  –– at the trial?

3          So the question would be to the –– one of the

4   defendant's witnesses, "Did you intend to defraud the

5   government"?  And they say, "No."  And that's the end of it.

6   That answer –– that question and that answer doesn't call up

7   any additional questions that I want to ask, other than, "Well,

8   what about in this document where you say you knew this was

9   illegal" ––

10          THE COURT:  So then if Mr. Loveland comes up and asks

11   the witness after that, "You indicated you did not intend to

12   violate the law.  Did you –– did you think that you were

13   following the law"?  And he says ––

14          MS. BENNETT:  Exactly.

15          THE COURT:  –– "Yes."

16          Then all of a sudden the attorney–client privilege

17   is –– is waived?

18          MS. BENNETT:  Yes, Your Honor.  But what ––

19          THE COURT:  Just because of that phrasing of those

20   two questions?

21          MS. BENNETT:  Yes, Your Honor.

22          THE COURT:  We're going to –– we're going to abandon

23   the attorney–client privilege based on that?

24          MS. BENNETT:  Yes, Your Honor.

25          THE COURT:  So all the defendant can do is just say,

1    I deny the allegations ——

2              MS. BENNETT:  That's correct.

3              THE COURT:  —— I deny intent, but I can't explain

4    why?

5              MS. BENNETT:  So if the Court ——

6              THE COURT:  That's your argument; correct?

7              MS. BENNETT:  Yes, if the Court ——

8              THE COURT:  And that's your position?

9              MS. BENNETT:  Yes, Your Honor.  But if the Court

10   would allow me to go on with my hypothetical of how I think

11   this is different.

12             The question is asked, "Did you intend to defraud"?

13   And the answer is, "I didn't intend to defraud.  I at all times

14   had a good faith belief and made good faith efforts to comply

15   with the law."  That's what the defendant's saying.  The Court

16   needs to focus on what the defense is that the defendant

17   intends to offer.  And the defense is not going to just be, "I

18   didn't intend to violate the law."  They're going to go on to

19   say, "I made good faith efforts at all times to comply" ——

20             THE COURT:  Well, if they ——

21             MS. BENNETT:  —— "with the law."

22             THE COURT:  If they say, "I made good faith efforts

23   at all times to follow the law," then you believe at that point

24   they have waived the privilege with regard to what those good

25   faith efforts are and you should be able to explore whether

 1    they included discussions with counsel?

 2            MS. BENNETT:  Yes, Your Honor.  And I think not only

 3    would I think that, but the jury would think that.  The jury

 4    would be there sitting there thinking, "Well, let's hear about

 5    what those good faith efforts are."  And then my follow-up

 6    question —

 7            THE COURT:  All right.  Well, I'm going to get to the

 8    defendants in a moment as to exactly what their good faith

 9    defense is.

10            But in *Cox,* I just want to make sure I understand

11    your position with regard to what the Court of Appeals meant.

12    It's on page 14-19 of that decision, there at the beginning of

13    head note 38.

14            MS. BENNETT:  Yes, Your Honor.

15            THE COURT:  Judge Carnes writes that "USX" — meaning

16    the employer, the defendant — "could have denied criminal

17    intent without affirmatively asserting that it believed that

18    its change in pension fund policy was legal.  Having gone

19    beyond mere denial affirmatively to assert good faith, US

20    injected the issue of its knowledge of the law into the case

21    and thereby waived the attorney-client privilege."

22            So you read that to mean that this is — this has

23    nothing to do with really whether defendant is raising a

24    affirmative defense.  If the defendant goes beyond simply

25    saying, "We deny intent," and they further explain that "The

1  reason we deny intent is because we're following the law," then

2  they've injected knowledge of the law in the case and the

3  privilege is waived?

4          That's the way you read that provision —

5          MS. BENNETT:  Yes, Your Honor.

6          THE COURT:  — or that opinion?  Okay.

7          MS. BENNETT:  And I think the 11th Circuit

8  specifically says that the defendant doesn't have to raise an

9  affirmative defense for this ruling to apply.

10         And I'd just like to illustrate that with another

11  example of what could happen in the courtroom.  This is the

12  difference between someone who's charged with murder coming in

13  and saying, "I didn't do it," and coming in and saying, "I had

14  a legal justification to kill that person."  And then the jury

15  is immediately questioning what is the legal justification, who

16  told them that it was okay to kill this person.  Maybe he's

17  alleging self-defense or protection of others.  And that's

18  where the fairness issue comes in.

19         The fairness issue to the plaintiff not being able to

20  respond by asking the further question, "Well" — in my other

21  hypothetical — "I had a good faith — I made good faith

22  efforts to comply with the law."  The next question from me is,

23  "What were those good faith efforts?"  And the defendant's

24  witnesses say, "I can't tell you that because it's a secret

25  between me and my attorney."

1             And there's just a simple unfairness.  And that's

2    what the *Cox* court is ——

3             THE COURT:  Well, I don't know that I disagree with

4    that.  If the position of the defendant is going to be that,

5    "We undertook all of these efforts to make sure we complied

6    with the law, but I can only tell you about some of them," then

7    that could be problematic.  I could —— but if they're just

8    going to get up there and testify that, "We're professionals in

9    the health care industry, and we believe these transactions

10   complied with the law," the question is whether or not that has

11   injected into the case a suggestion that their attorneys were

12   involved in that —— in their —— the knowledge that they

13   received with regard to the legality of the transaction.

14            I understand *Cox* is strong in your position.  I'm

15   not —— I'm just trying to make sure that I fully understand how

16   far we're going to carry it.

17            MS. BENNETT:  And, Your Honor ——

18            THE COURT:  Let me ask you.  Under the False Claims

19   Act, I understand the safe harbor defenses.

20            Is there a separate affirmative defense that the

21   defendant did not knowingly make a false statement or false ——

22   submit a false claim or is that just part of the —— of

23   objecting or denying the plaintiffs' main claim?

24            In other words, the statute does not provide that

25   type of affirmative defense; correct?

```
 1              MS. BENNETT:  No, Your Honor.  It's not in the
 2    statute.
 3              THE COURT:  So we don't have a classic affirmative —
 4    if a defendant's position is, "We didn't know we were violating
 5    the law," that's not a classic affirmative defense — or is
 6    it — that they have the burden of proof on?
 7              MS. BENNETT:  If that's the defense, that "We didn't
 8    know we were — we didn't knowingly violate the law," that is
 9    not an affirmative defense.
10              THE COURT:  Okay.  That's just part of defending the
11    plaintiffs' claim that they did knowingly violate the law?
12              MS. BENNETT:  Yes, Your Honor.
13              THE COURT:  Okay.
14              MS. BENNETT:  And, Your Honor, I think that this
15    issue inevitably leads to a question in my mind about whether
16    or not the defendant is going to be actually, in fact, at the
17    end of the day asserting an advice-of-counsel defense.  And I
18    think it's a case management —
19              THE COURT:  Well, that — but that's clear that if
20    they do that, then Cox clearly — and probably other cases —
21    would find an implied waiver of the privilege.
22              It's my understanding that counsel has affirmatively
23    stated in response to the briefing that they do not intend to
24    assert an advice-of-counsel defense.  But we're going to get to
25    that in a minute when I question the defendants.
```

1            So in this case, if the defense is, "We did not

2     knowingly violate the law," then, as you say — as you stated,

3     that issue is just resolved by the jury — by the jury deciding

4     has the plaintiff carried the burden of proof in showing that

5     the defendant knowingly violated the law?

6            MS. BENNETT:  Yes, Your Honor.

7            THE COURT:  Okay.  All right.  And, again, your —

8     you explain the distinction in *Cox* about being able to deny

9     intent and not waive it, meaning that all the defendant can do

10    there is just say, "Jury, we deny intent"?

11           MS. BENNETT:  And the plaintiff hasn't proved that we

12    acted knowingly.

13           THE COURT:  Right.  But once a defendant explains why

14    they denied intent, and if that explanation includes an

15    explanation that "We thought we were following the law," then

16    that opens the door to the attorney-client privileged

17    information?

18           MS. BENNETT:  Yes, Your Honor.

19           THE COURT:  Okay.

20           MS. BENNETT:  And we can tell from the defendants'

21    privilege log that they consulted frequently with attorneys on

22    this issue.

23           THE COURT:  Well —

24           MS. BENNETT:  So it's not —

25           THE COURT:  I mean, it doesn't matter — it doesn't

1 really matter that the material —— in the analysis of whether

2 attorney—client privilege has been waived, it doesn't really

3 matter whether the material is relevant or not.  I mean, the

4 waiver of attorney—client privilege presumes the information is

5 going to be relevant.

6           MS. BENNETT:  Exactly.

7           THE COURT:  But the privilege trumps it.

8           So, you know, you may say, Okay, they say this at

9 trial, and it would be relevant to determine whether they said

10 the same thing to their attorneys or whether the attorneys said

11 the same thing to them.  It would be relevant to know that

12 information and it would be —— some people would think it would

13 be fair to find that information.

14           MS. BENNETT:  Only under ——

15           THE COURT:  But that can't be the standard for

16 whether attorney—client privilege is waived.  Because if that

17 were the standard, it would be waived in every situation.

18           MS. BENNETT:  It's only waived when the defendant

19 injects into the case an issue ——

20           THE COURT:  Lawfulness.

21           MS. BENNETT:  Right.  That in fairness requires the

22 examination of all of the opinions they got about the

23 legality ——

24           THE COURT:  Okay.  Well, let's get to that fairness.

25           As I understand it, the precise holding in *Cox* is

```
 1   that when the district judge, in his discretion, concluded that
 2   in fairness the attorney-client information should be
 3   discovered, the district judge did not abuse his discretion.
 4            Is that the precise holding in Cox?
 5            MS. BENNETT:  Yes, Your Honor.
 6            THE COURT:  Okay.  So when evaluating an abuse of
 7   discretion — so that means I've got the discretion — the
 8   district judge has got the discretion to determine whether it
 9   would be unfair to not allow you to discover this information?
10   You agree with that?  As long as I don't abuse it.  I mean,
11   that — it —
12            MS. BENNETT:  Yeah —
13            THE COURT:  Yeah, as long as I don't abuse it.  Okay.
14            MS. BENNETT:  I was trying to think how to word that.
15            THE COURT:  Right.
16            And when I'm trying to make this decision as to
17   whether it's fair or not, what are the factors that you would
18   suggest that I have to consider so that this is not just some
19   arbitrary feeling about whether it's fair or not?
20            What — what are those factors that I should be
21   considering to make sure I don't abuse it?
22            I guess your position is, if — under Cox, if I don't
23   let you get the stuff, then I have necessarily abused it?
24            MS. BENNETT:  I would potentially make that argument
25   on appeal.
```

```
 1              THE COURT:  Yes.

 2              Tell me the factors you think I should be

 3    considering.

 4              MS. BENNETT:  Well, if I could just step back to Cox

 5    for a minute.

 6              THE COURT:  Okay.

 7              MS. BENNETT:  I actually read Cox to presume

 8    unfairness.  If a party is allowed to inject its good faith

 9    belief and the legality of its conduct into a legal proceeding,

10    I think that Cox presumes that that is going to be unfair to

11    the opposing party, because that —

12              THE COURT:  So you think there is no discretion?  You

13    think that Cox is a bright-line rule that whenever a party

14    raises the legality — takes the position that they thought

15    their conduct was lawful, then as a matter of law they have

16    waived the attorney-client privilege and any analysis by a

17    district judge otherwise would — would absolutely be an abuse

18    of discretion.

19              MS. BENNETT:  Yes.  It would be unequitable to allow

20    the —

21              THE COURT:  Why didn't Cox just say that?  Why did

22    they — why did they say that "We hold that the judge did not

23    abuse his discretion"?

24              MS. BENNETT:  Well, I think all —

25              THE COURT:  They also said, in reviewing discovery
```

1    orders, that the trial judge is entitled to great deference.

2            Why would they not have just said that the — that

3    there's a bright-line rule and it doesn't matter?

4            MS. BENNETT:  I read *Cox* to set forth a bright-line

5    rule.

6            THE COURT:  Okay.

7            MS. BENNETT:  I think that —

8            THE COURT:  Fair enough.

9            MS. BENNETT:  — all evidentiary decisions are

10   reviewed in the Court of Appeals on an abuse of discretion

11   standard.  I agree with that.  But what the district court

12   said — and the 11th Circuit affirmed that — is that it would

13   be inequitable to allow the defendant to present evidence that

14   it intended to comply with the law while cloaking in privilege

15   any information that might —

16           THE COURT:  Well —

17           MS. BENNETT:  — cast doubt on that assertion.

18           THE COURT:  Let me follow up with you on that.

19           MS. BENNETT:  Yes, sir.

20           THE COURT:  The plaintiff also sued the union —

21           MS. BENNETT:  Uh-huh.

22           THE COURT:  — claiming that the union's — in *Cox* —

23   claiming that the union's conduct was unlawful.

24           MS. BENNETT:  Yes.

25           THE COURT:  I think it's fair to conclude that the

1    union took the similar position to the company, that their

2    conduct was lawful, that they felt their conduct was lawful.

3            If there is a bright-line rule, then why did the

4    Court of Appeals rule in *Cox* that information between the union

5    and its attorneys on that issue was privileged and that the

6    district court did not —— and —— because there was no prejudice

7    shown?

8            If there's this bright-line rule, how could they hold

9    that the materials —— the attorney-client materials between the

10   union and its lawyers is privileged and there's been no waiver

11   and yet there is a waiver with regard to the employer and its

12   attorney?

13           MS. BENNETT:  The analysis in *Cox* about the waiver of

14   the privilege by the union is a completely different analysis.

15           THE COURT:  Well, it is —— it is - part of it is,

16   because part of it goes into all this discussion about whether

17   a union can assert a privilege on behalf of its members and all

18   that.  But at the end of the day the conclusion and the holding

19   with regard to that ruling, as I read it, was that the

20   materials between the union and its attorneys were not subject

21   to discovery and there was no waiver, and there's a one-phrase

22   statement that because the union has not come forward to show

23   prejudice.

24           MS. BENNETT:  The union members.

25           Your Honor, I think that the —— I respectfully

1    disagree with the Court's reading of that.

2            What happened in the union versus the union member

3    situation is that the union members argued that there was an

4    implied waiver, that the union has made selective disclosures

5    of attorney-client privileged material and that — because they

6    selectively disclosed some of the privileged material that they

7    were obligated to disclose — that it was a waiver — a scope

8    waiver.

9            And so the analysis of that issue was conducted under

10   the implied waiver law, which is different from the *Cox*

11   affirmative assertion of a defense into the case.  And in the

12   implied waiver situation, the person who's moving to waive the

13   privilege has to show prejudice.  That's the difference between

14   the union member situation and the defendant situation,

15   vis-a-vis the —

16            THE COURT:  So you don't read — you don't read the

17   *Cox* holding with regard to the employer — privileged

18   information — you don't read that as a holding that there has

19   been an implied waiver of the privilege —

20            MS. BENNETT:  No.

21            THE COURT:  — because the —

22            MS. BENNETT:  No.

23            THE COURT:  You don't read *Cox* as saying that when

24   you — when you inject into the case the legality of your

25   conduct that you are impliedly waiving the privilege?  You

1    don't see — you don't believe that's *Cox's* holding.

2          MS. BENNETT:  No.  I think that *Cox* discusses two

3    separate types of waiver.  One of the types of waiver, which

4    doesn't exist here yet, but might in the future, is where

5    you — where the defendant — or a party — makes a selective

6    disclosure of attorney—client documents.  That's an implied

7    waiver, because the courts have held that you can't stand on

8    the privilege while taking action —

9          THE COURT:  Correct.

10         MS. BENNETT:  — contrary to that.

11         So that has to be analyzed under the law that applies

12   to implied waiver.  And that is, what is the scope of the

13   waiver, who does the waiver go to in this case, was it a waiver

14   as to the union members or was it a broader waiver.  And that's

15   a different analysis.

16         THE COURT:  Are you saying that's the waiver they

17   analyzed to hold that the — that the union had not — there

18   was no waiver with regard to the union?

19         MS. BENNETT:  Yes.

20         That wasn't addressed in the context of the union

21   asserting as a defense that they thought their behavior was

22   lawful, that they —

23         THE COURT:  But you — it would be your belief that

24   if the union in that case took the position that they thought

25   their conduct was lawful, just like the employer did, then in

 1    that case there should have been a waiver of the attorney-

 2    client privilege?

 3              MS. BENNETT:  Yes, Your Honor.

 4              THE COURT:  So your argument would be the lawyers

 5    there against the — in asserting their union — the claim

 6    against the union, they just didn't argue the right thing?

 7              MS. BENNETT:  I think that —

 8              THE COURT:  Surely the union there claimed that their

 9    conduct was lawful.

10              MS. BENNETT:  I don't recall that being part of

11    their —

12              THE COURT:  Okay.

13              MS. BENNETT:  — claim.

14              THE COURT:  I'm not sure it was in the opinions

15    precisely, but I would — well, tell me what the waiver is,

16    then, that — that the *Cox* holding — what do you call that if

17    you don't call it implied waiver?

18              MS. BENNETT:  It's a waiver that is based on the

19    assertion of a certain defense, whether you call it an

20    affirmative defense or another kind of defense, that injects

21    into the proceeding the defendant's assertion that it at all

22    times had a good faith belief that it was in compliance with

23    the law.  And the jury —

24              THE COURT:  Well, what do the courts call that?

25              MS. BENNETT:  I'm not sure —

 1            THE COURT:  You don't think — you don't think Judge
 2   Carnes was thinking that this was an implied waiver by
 3   injecting into the case the position that you thought your acts
 4   were lawful —
 5            MS. BENNETT:  I think Judge —
 6            THE COURT:  — that you were impliedly waiving the
 7   privilege?
 8            MS. BENNETT:  I think that what Judge Carnes might
 9   say is there's nothing implied about that.  That's right out
10   there front and center.  "I'm going to tell you that my actions
11   were lawful, and the reason I believe that..." dot, dot, dot —
12   which anyone on the jury will be able to figure out for
13   themselves when they see the defendant coming with their
14   valence (phonetic) of high-priced lawyers, is that they had
15   legal advice.  And they did have legal advice.
16            I think that's different from what happens when —
17   what I would call the cake — I want to have my cake and eat
18   it, too.  Which is I'm going to dribble out information about
19   the fact that my conduct was approved by lawyers without making
20   a definitive statement that that's how I'm going to defend the
21   case.
22            THE COURT:  Okay.  I thought that he was traveling
23   under the Implied Waiver Doctrine.  But I'll go back and take a
24   look at that.
25            You say that there would be a difference, I guess,

1   because under the Implied Waiver Doctrine you know what — in

2   addition to the unfairness, you've got to show that you were

3   prejudiced?

4          MS. BENNETT:  Yes.

5          THE COURT:  And you don't think you've got to show

6   prejudice under this *Cox* waiver?

7          MS. BENNETT:  I think I could show prejudice.

8          THE COURT:  But do you think you don't have to?

9          Is that the main difference here between implied

10  waiver and *Cox* waiver?

11         MS. BENNETT:  I think the *Cox* waiver is that in —

12  the unfairness is implicit in the situation, where you say your

13  actions were completely lawful, but you're going to tell the

14  jury and the other side, "I can't tell you why I thought that,"

15  because that's private.

16         But I — if the Court feels that the relator needs to

17  show prejudice, I think the prejudice is the same, that the

18  relator's attorney is left in front of the jury saying, "I

19  can't explore what the basis of your good faith belief is

20  because you're holding those communications private and

21  protected."  That leaves you in a seriously disadvantageous

22  position.

23         And by the way, Your Honor, I would add that there's

24  no requirement that the defendant defend on this basis.  They

25  can simply deny intent.  And the defendant has made quite clear

1  and you agree —

2          THE COURT:  They can deny intent but then not explain

3  why they didn't have intent?

4          I mean, they can do that, sure.

5          MS. BENNETT:  They can.  They absolutely can.  And we

6  have the burden of proving what the intent is.  We have to

7  prove by circumstantial evidence —

8          THE COURT:  What if they get up there — what if

9  their position is, "The plaintiff has the burden of proving

10 that we knowingly violated the law"?

11         MS. BENNETT:  They're gonna.

12         THE COURT:  "And we think after all the evidence is

13 in there's not going to be sufficient evidence to convince you

14 that they showed that our clients knew what they were doing

15 violated the law."

16         MS. BENNETT:  They're gonna do that.  They can do

17 that in argument.

18         THE COURT:  They can do that without — without

19 implicating the *Cox* waiver?

20         MS. BENNETT:  They can do that in argument.  And *Cox*

21 says that specifically, that in a criminal case — or a civil

22 case — it really doesn't matter — that they —

23         THE COURT:  They just can't put up a witness that

24 says that?

25         MS. BENNETT:  Exactly.

1          THE COURT:  Okay, so in a criminal case, if

2    somebody's being prosecuted on the Anti-Kickback Statute, is it

3    your position that if the defendant takes the stand and says,

4    "I thought I was following the law" — in the criminal case —

5    then the U.S. Attorney at that point would have the right to

6    ask for a recess and then subpoena all of the attorney-client

7    privileged information relating to that — to whether or not

8    the attorney had advised him in advance that he was following

9    the law or not?

10          MS. BENNETT:  Yes, Your Honor, that's —

11          THE COURT:  In a criminal case?

12          MS. BENNETT:  Yes.  And that's what this 2nd

13    Circuit — I hesitate to cite cases out of a circuit after I

14    put all my eggs in the 11th Circuit basket — but that's

15    exactly what happened in the 2nd Circuit case, the *Bilzerian*

16    case, which is sort of the grandfather to *Cox* in a lot of

17    decisions by other circuits about the waiver.

18          The — it was a securities fraud case.  The defendant

19    took the stand and said, "I thought that the disclosures I made

20    to the SEC were at all times in compliance with SEC law and

21    regulation."  That's exactly what happened.

22          THE COURT:  Did he also suggest or say that he

23    thought that because he had consulted with his attorneys?

24          MS. BENNETT:  No.  But that's exactly what happened.

25    And I can tell you as a former A.U.S.A. that that's exactly

1    what we would have done.  If a defendant had injected his good

2    faith belief and the legality of his conduct into his testimony

3    in front of a jury, we would have asked for a recess and asked

4    for a subpoena to his attorney, and it probably would have been

5    granted.

6              THE COURT:  Let me just go through some of these —

7    well, I think I've covered most of this.  I'm going to give you

8    a chance to summarize whatever you want to summarize, but let

9    me make sure that I've touched on some of these things that I

10   wanted to address with you before I address the defendant.

11             As to the scope of the materials that you're seeking,

12   you're only seeking attorney-client communications that relate

13   to any discussion of the legality of the transactions; is that

14   correct?

15             MS. BENNETT:  Yes, Your Honor.  Right now we're

16   focused on the legal advice they might have received with

17   respect to the Tidwell Cancer Treatment purchase and the

18   compensation relationship between CRHS and Regional Oncology of

19   Columbus.  But I want to make clear that if the Court —

20             THE COURT:  I understand.  You — as it develops, if

21   they take a — your position is that whenever they take the

22   position in response to your false act — False Claims Act

23   claim that "We thought what we were doing complied with the

24   law," then they have waived attorney-client privilege, and

25   you're seeking evidence related to take, even if it's within

 1    the attorney-client privilege?

 2              MS. BENNETT:  Yes, Your Honor.

 3              THE COURT:  And do you — you're seeking it only up

 4    to the time that the transactions were consummated; correct?

 5              I mean, anything that obviously happened after the

 6    lawsuit wouldn't be relevant.  It's up until the time that they

 7    committed the conduct; correct?  I mean, you're not seeking

 8    some communication that happened last week?

 9              MS. BENNETT:  I think my response to that would be

10    that we have to focus on the defendant's intent at the time the

11    transactions were —

12              THE COURT:  Right.

13              MS. BENNETT:  — undertaken.

14              THE COURT:  Which is easy to do with regard to the

15    Tidwell transaction.

16              With regard to the compensation of the Radiation

17    Oncology Associates, you contend that unlawful conduct is

18    ongoing or do you contend that what you're fighting about is up

19    until the time you filed your lawsuit or prior?

20              What — because that's going to — if I were to allow

21    you to get this information, that's going to be the next

22    argument, is what's the time period that you're seeking.  Now,

23    for Tidwell, it seems clear it would be up to the time the

24    transaction was consummated.

25              MS. BENNETT:  So just to give the Court a little bit

1   of factual background, the compensation arrangements with

2   Regional Oncology are basically medical director ——

3   professional services contract.  They go back quite a way, to

4   at least 2007, as far as I know right now.  They've done the

5   discovery to date.

6          So my response to the Court would be we're entitled

7   to attorney-client privilege information that reflects on the

8   original agreements and any renewals of those agreements which

9   might have reconsidered whether the arrangements were legal or

10  illegal ——

11         THE COURT:  Have you made all this clear in your

12  motion to compel as to precisely the time period for what

13  you're seeking?

14         MS. BENNETT:  I don't know if we spelled that out.

15  But that's certainly our position, that at each renewal

16  opportunity ——

17         THE COURT:  Each renewal.

18         MS. BENNETT:  —— there is an opportunity to revisit

19  the legality of the arrangements.

20         With respect to the Court's other question, is when

21  does this stop, my understanding of the law in the 11th

22  Circuit, US —— USX —— well, *Walker vs. R&F Properties,* is that

23  the cutoff is the date of the amended complaint.  The cutoff of

24  the appropriate discovery in the case would be the date of the

25  filing of the relator's amended complaint and ——

1        THE COURT:  So no later —— it would be no later than
2    that under any circumstances?
3        MS. BENNETT:  Yes, Your Honor.  The 11th Circuit law
4    is also quite clear on that.
5        THE COURT:  Okay.  All right.  Okay, I will —— I
6    think at the end I'll come back and let you summarize anything
7    you want to address before we conclude, but let me move to the
8    defendants.
9        Who's going to handle this for the defendants?
10       MR. PAULHUS:  Michael Paulhus, Your Honor.
11       THE COURT:  Okay.  Mr. Paulhus.  Is it —— Paulhus?
12       MR. PAULHUS:  Yes, sir.
13       THE COURT:  Okay.  Let me, first of all, get an
14   understanding specifically of what your, quote, good faith
15   follow-the-law defense is.
16       What is the position of the defendants?  What defense
17   are you attempting to assert?
18       MR. PAULHUS:  Your Honor, we're attempting to
19   assert —— we really view it as the flip side of denying intent.
20   So it's the absence of the intent to violate the False Claims
21   Act, that we acted in good faith, believing that we were in
22   compliance with the law at the time that we submitted the
23   claims at issue.
24       THE COURT:  All right.  Well, how —— how does that ——
25   I mean, I don't want you to reveal trial strategy, I don't

1    guess, but how is that going to play out at trial?  I mean,

2    what are these folks going to say?

3            MR. PAULHUS:  I think a sample colloquy would be, if

4    asked, "What would your — did you have an understanding of

5    whether you were in compliance with the *Stark* statute when you

6    submitted the claim," and the answer would be, "Yes, I believe

7    that we were in compliance with the *Stark* statute," of a fact

8    witness from the hospital.

9            THE COURT:  And you're not going to ask them why?

10   You're just going — you're just going to let the jury sit

11   there and think, "Okay, that's good enough for me"?

12           MR. PAULHUS:  No.  I think —

13           THE COURT:  "That nice doctor or that nice person

14   from the hospital says they complied, so they must have

15   complied."

16           MR. PAULHUS:  Your Honor, I think I would ask follow-

17   up questions —

18           THE COURT:  Like what?

19           MR. PAULHUS:  Such as, "Explain to me why you feel

20   that you met the elements of the *Stark* law exception that

21   you're traveling under."

22           THE COURT:  All right.  And what are they going to

23   say?

24           MR. PAULHUS:  So the question is, "Well, one of those

25   elements is fair market value; correct?

1          "Yes, it is.

2          "Did you understand that the transaction was at fair

3   market value?

4          "Yes, I did.

5          "And how did you understand that?"

6          And then I would expect the witness to explain what

7   their understanding of the market was and why the transaction

8   was at fair market value.

9          THE COURT:  Are you going to ask them whether there

10  was any component to this that — that there was an agreement

11  to get any kickbacks for making referrals of patients?

12         MR. PAULHUS:  I suspect we would ask them whether

13  there was any intent to induce referrals in response to the —

14  to a payment.

15         THE COURT:  Well, if they're going to testify that —

16  are they going to testify as to the basis for their

17  understanding of the *Stark* law or the Anti—Kickback Statute?  I

18  mean, are they going to say, "We've been in the business, and

19  we know we have to comply with these things, and we seek to

20  comply, and we think we complied here"?  Are they going to say

21  that kind of thing?

22         MR. PAULHUS:  I believe so, Your Honor.

23         THE COURT:  And this jury is going to understand, I

24  think, that they are sophisticated, professional people.  I

25  think you're going to want the jury to think that they're

1    sophisticated professional people.

2        Do you not think the jury is also going to think that

3    they got some advice on these issues from legal counsel?

4        MR. PAULHUS:  I suspect the jury may wonder if that

5    happened or not and —

6        THE COURT:  Well, is it unfair for the jury not to be

7    informed whether legal counsel said that you're correct in your

8    professional experience that these transactions do comply with

9    the Anti-Kickback Statute?

10        MR. PAULHUS:  I don't think that's unfair, Your

11    Honor, because I think the distinction I would draw would be if

12    the witness were to say, "The reason I don't believe that to be

13    accurate is that I consulted with lawyer and lawyer told me X,"

14    then I understand that, that there would be an issue of waiver

15    and it would be fair to hear if there were other —

16        THE COURT:  That's not what *Cox* says.

17        You realize *Cox* is a challenge for you on this

18    motion?

19        MR. PAULHUS:  I appreciate that relator relies

20    heavily on *Cox*.  I think — would you like to hear —

21        THE COURT:  Well, the example you just gave is not

22    *Cox*.  The example you just gave is if the witness said, "I

23    talked with an attorney, and he told me this was okay."  Then

24    clearly under that circumstance it's notwithstanding *Cox*.  That

25    would waive the attorney-client privilege as to what was said

1    between the client and the attorney, but that's not *Cox*.

2            MR. PAULHUS:  Right.

3            THE COURT:  *Cox* is, if you inject into the case and

4    take the position affirmatively that you thought you were

5    complying with the law in good faith, then the way I read

6    *Cox* — the defendant doesn't agree with my terminology — the

7    way I read *Cox* was under those circumstances you have impliedly

8    waived the attorney-client privilege.

9            MR. PAULHUS:  Your Honor —

10           THE COURT:  So explain to me how what you're doing —

11   when your client comes to the stand and says, "We thought we

12   were following the law and this is why" — and he doesn't say

13   anything about talking with attorneys, but he says, "This is

14   why we think we were following the law" — why does *Cox* not

15   apply to that situation so you've waived the attorney-client

16   privilege?

17           MR. PAULHUS:  I think that *Cox* turns on a different

18   factual scenario that's important to appreciate.  In *Cox* the

19   underlying predicate RICO violation was a violation — it was

20   essentially bribery of a union negotiator.

21           I believe — my sense is from *Cox* that the Court may

22   have felt that there was no need to deny or to put at issue the

23   understanding of the law by the defendant.  Whereas, in our

24   case, the way the statute —

25           THE COURT:  Whoa, whoa, whoa.  Let me — I don't

1  understand that.

2          As I understand the RICO statute, there is a — the

3  plaintiff in — under RICO has got to prove intent to violate

4  the law.

5          MR. PAULHUS:  That's correct.

6          THE COURT:  And as I understand, what happened in *Cox*

7  is — well, what happened was the — U.S. Steel, the employer,

8  got together with some union representatives, who were

9  supposedly representing the union, and in negotiating the

10  contract with the union, and those union representatives wanted

11  to feather their nest because they didn't think their

12  retirement — their pension was good as they wanted it to be.

13  So they went to the employer and said, "Look, if y'all change

14  the pension policy so that we're going to get a better pension,

15  then we'll agree on behalf of the union to a union contract

16  that's going to save you, U.S. Steel, millions and millions of

17  dollars."  And so it was, in essence, an alleged bribe that

18  allegedly damaged the union members.

19          And so one of the claims that you allude to is the —

20  the other folks in the union sued them under RICO.  And part of

21  what they had to do — claiming that this corrupt deal was

22  against the law, claiming that it was unlawful for the employer

23  to bribe the union representatives.  And so they had to prove

24  in the RICO claim that the conduct of the — U.S. Steel was

25  unlawful and that when U.S. Steel agreed to paid the pension

 1   and approve the pension, they knew that was against the law;

 2   they intended to violate the law when they did that.  And U.S.

 3   Steel took the position that "We had a good faith belief that

 4   by doing this we weren't violating the law."

 5           And Judge Carnes said, "Well, by asserting — by

 6   raising that defense, you've waived attorney—client privilege

 7   because the plaintiffs ought to now be able to discover what

 8   your attorneys told you in that regard.  Even though you didn't

 9   say you're relying on your attorneys, even though you didn't

10   suggest that that's why you had a good faith belief, the fact

11   that you indicated that you thought you followed the law opened

12   the gate to the attorney's office — or the door to the

13   attorney's office."

14           Explain to me how that is different than this

15   situation, where they're claiming that your folk knowingly and

16   intentionally violated the law, and you're contending, "No, we

17   didn't knowingly violate the law; we thought we were following

18   the law, just like U.S. Steel said in *Cox,* and we're not saying

19   that we relied on attorneys, but we're just saying we were —

20   we thought we followed the law."

21           Explain to me how that is a different situation,

22   other than, well, this is health care and knowing health care,

23   you've got a lot of different — you got a lot more law.

24           MR. PAULHUS:  That's exactly —

25           THE COURT:  Explain to me how this is distinguishable

1    from *Cox* other than making the arbitrary distinction that,

2    okay, when you've got this much law involved, you've got no

3    waiver, but when you've got this much law involved, you've got

4    a waiver.

5         How can that possibly be a legal principle?

6         MR. PAULHUS:  A couple of points in response, Your

7    Honor.  In the predicate act, the RICO statute, the

8    fraud/bribery statute, it's a fairly simple statute.  It's 29

9    U.S.C. 186.  It prohibits the payment of money to a specified

10   representative.  It's fairly simple.

11        There's really, I think, no need to defend that

12   action —— and it has a willful —— by the way, it has a willful

13   component.  It says that one acts willfully —— willfully

14   violates the section.

15        I would distinguish that from the case that we have

16   before us, which includes, in large part, a *Stark* violation.

17   *Stark* is not a criminal statute.  It's a complicated regulatory

18   scheme.  And the way the False Claims Act is set up, we are

19   going to be forced to defend the plaintiffs' burden that we

20   either acted intentionally, with reckless disregard, or we're

21   deliberately ignorant.

22        In the criminal bribery statute, one could just say,

23   "I did not act willfully."  In our case the question will be

24   posed ——

25        THE COURT:  That's not what they did.  That's not

1  what Judge Carnes presumed they did.  What Judge Carnes said

2  they did in *Cox* is that they said that "Our conduct — "we do

3  not believe our conduct to be unlawful."

4          And Judge Carnes said that by doing that they

5  injected into the case that issue, which it would be unfair to

6  not allow them to discover attorney-client information.

7          MR. PAULHUS:  I may —

8          THE COURT:  So, I mean, theoretically you can list

9  pages probably of the difference between the RICO statute and

10  the False Claims Act.  But there's no indication in *Cox* that

11  any of those distinctions had anything to do with the holding

12  in *Cox*.

13          MR. PAULHUS:  I would —

14          THE COURT:  And what you're suggesting to me is

15  that — well, what is your position as to what *Cox* holds?

16          MR. PAULHUS:  My position is that *Cox* holds that it

17  was not an abuse of discretion, based on the facts before the

18  Court in that discovery dispute.

19          THE COURT:  Which were what?

20          MR. PAULHUS:  There are —

21          THE COURT:  Did I accurately describe them?

22          MR. PAULHUS:  You did, Your Honor.  I believe —

23          THE COURT:  How is that different than here, the

24  facts?

25          MR. PAULHUS:  Well, if I may, there were — there are

1   some other facts that are — that appear in the appellate

2   pleadings, which seem to have been at issue in *Cox*, which

3   include the fact that there were privileged documents that were

4   inadvertently produced that the district court found a waiver

5   over, which would have —

6           THE COURT:  Can I base my decision and interpretation

7   in *Cox* on the briefing in *Cox*?

8           I thought I was restricted to the court's — the four

9   corners of the court's ruling.

10          MR. PAULHUS:  I'm not sure that I know the answer to

11  that, Your Honor.  It seems —

12          THE COURT:  I don't see a whole lot of opinions out

13  there where the judge is citing to briefs in another case —

14          MR. PAULHUS:  I agree with that.

15          THE COURT:  — of legal precedent.  I think it's sort

16  of like, you know, when a contract's entered into.  It all

17  merges into that final document.  I think it all merges into

18  the opinion.  I would — that would be unusual to —

19          MR. PAULHUS:  I agree with that, Your Honor.  I —

20          THE COURT:  Okay.  Well, let's go back, just for —

21  and I interrupted, and I try not to do that.

22          MR. PAULHUS:  So my point, I think, was —

23          THE COURT:  Make the distinction for me clearly

24  between *Cox* and here.

25          MR. PAULHUS:  Sure.  Cox — the predicate act is a

1    criminal statute that has a willfulness requirement.  It's a

2    criminal statute.  In our case, there is one criminal statute,

3    but there are also civil statutes, one of which is essentially

4    a strict liability statute.

5           Our level of intent that can be met to violate this

6    statute, the False Claims Act, is either actual intent,

7    deliberate ignorance or recklessness.  We are going to be

8    forced to explain why we were not deliberately ignorant, why we

9    were not reckless.  And so I don't really have an option to not

10   put at issue — to not respond to the question of "What did you

11   understand, what was your knowledge of whether you complied

12   with the law when you" —

13          THE COURT:  But wouldn't the defendants in *Cox* have

14   wanted — have felt compelled to do the same thing?

15          If you were representing U.S. Steel — and

16   Ms. Bennett may be representing U.S. Steel in that case.  I

17   don't know.  But if you were representing U.S. Steel, wouldn't

18   you have wanted to be able to explain why you didn't think that

19   your folks had intentionally violated the law?

20          MR. PAULHUS:  I do think I would have liked the

21   opportunity to do that.  But recognizing if I am adding

22   something new to the action, that's not an integral part of the

23   plaintiffs' *prima facie* case.  Then under the rationale of *Cox*

24   I seem to put —

25          THE COURT:  Well, why wouldn't it be integral?

1          If the plaintiff in *Cox* had the burden of proving

2     that you intentionally violated the law, why wouldn't your

3     defense that "No, I did not, I thought we were following the

4     law," why would that not be integral in *Cox*, as integral in *Cox*

5     as your desire here to say, "No, we thought we were following

6     the law," and why?

7          Why the two — why is one less integral than the

8     other?

9          MR. PAULHUS:  The elements of the violation in *Cox,*

10    of the underlying criminal bribery statute, are very simple, I

11    think, and I'm not sure that it put at issue the complexity

12    that our — that our witnesses would have to determine as to

13    whether they —

14         THE COURT:  All right, so you're — you're seeking to

15    have this Court find a complexity exception to *Cox*?  Is that

16    the — is that the essential argument, that there should be a

17    complexity-of-the-law-exception to *Cox*?

18         MR. PAULHUS:  I'm not sure I would phrase it that

19    way, Your Honor.

20         THE COURT:  Well, that's how I'm understanding it.

21         Is that not the focus of your argument?

22         MR. PAULHUS:  No.  The focus of my argument is that

23    in the elements that are put at issue — the fundamental issue

24    in *Cox* is, is there something — is there an unfairness being

25    worked because the defendant has put some matter at issue —

1    affirmatively put something at issue such that it's unfair that

2    the plaintiff can't respond to that.

3            In our case, whether we knew what the law was is at

4    issue because of the *prima facie* elements of the plaintiff.

5            THE COURT:  As it is in RICO.  As it is in RICO and

6    *Cox*.

7            MR. PAULHUS:  I'm not sure that —

8            THE COURT:  Well, I'm confused about that?

9            MR. PAULHUS:  I'm not positive that —

10           THE COURT:  Ms. Bennett, you were a former Assistant

11   U.S. Attorney.

12           Does RICO not have an intent element?

13           MS. BENNETT:  Yes, Your Honor.  The RICO statute is

14   somewhat complicated, and I don't want to get into a long

15   explanation of it, but the underlying —

16           THE COURT:  But wouldn't a defendant under RICO have

17   the right to defend by saying, "I did not intend to violate the

18   law"?

19           MS. BENNETT:  Yes, Your Honor, in any criminal case.

20           THE COURT:  And wouldn't he be able to defend by

21   saying, "I thought what I did was following the law"?

22           MS. BENNETT:  Exactly.  That's exactly —

23           THE COURT:  And if the jury bought that, he would

24   prevail —

25           MS. BENNETT:  Yes, Your Honor.

```
 1              THE COURT:  —— in RICO?

 2              Okay.

 3              MR. PAULHUS:  Your Honor ——

 4              THE COURT:  Do you disagree with that?

 5              MR. PAULHUS:  I do not, but I would say that in the

 6   RICO Predicate Act it's just a willfulness requirement;

 7   whereas, in the False Claims Act there's a lower standard of

 8   deliberate or recklessness, which really puts at issue what a

 9   person knew about the law, were you deliberately ignorant;

10   well, did you even know what the law was.

11              THE COURT:  Well, wouldn't that be even more of a

12   reason for Cox to apply in this setting, if the issue is —— if

13   the defense is knowledge of the law and —— I mean, if that's

14   one of the central issues and that's one of the central

15   defenses, doesn't Cox say that that's a waiver?

16              MR. PAULHUS:  No, I think the central issue —— if the

17   question is that central issue raised by the other party's

18   affirmative case.  And in our case it clearly is a central

19   issue, what we knew; whereas, in Cox the central issue is did

20   you pay a bribe or not.  I'm not sure that ——

21              THE COURT:  So if you raise —— if you're raised —— I

22   thought we were following the law as a classic affirmative

23   defense, where you've got the burden of proof.  Then you think

24   Cox would find in that circumstance that you have waived

25   attorney-client privilege?
```

1          Are you making that distinction or are you — it

2   seems that you're making the distinction if it's something that

3   we come in and affirmatively assert —

4          MR. PAULHUS:  I wouldn't say that it would always

5   apply, but it would appear in the case law that often when

6   there's a — something that went affirmative put into the case

7   that you bear the burden on, that that can.

8          THE COURT:  So are you asserting in this case an

9   affirmative defense under which you've got the burden of proof

10  related to your lack of knowledge with regard to the —

11  violating the law?

12         MR. PAULHUS:  You're not asserting affirmative

13  defense, no, Your Honor.

14         THE COURT:  All right.  Now, do you have the burden

15  on the safe harbors?

16         MR. PAULHUS:  We do not.

17         THE COURT:  They have — the government has to

18  prove — the plaintiff has to prove that the safe harbors do

19  not apply?

20         MR. PAULHUS:  That's our position, Your Honor.  There

21  is case law that is — as we raised in our earlier briefing —

22  that diverges from that; although, our position is that the

23  11th Circuit has not foreclosed that issue as to —

24         THE COURT:  All right.  Well, let me ask you this.

25  If you've got — with regard to the safe harbors, if you take

1    the position at trial that "We didn't think that we were

2    violating the law because we were aware of safe harbors and we

3    took advantage of these safe harbors and under the law that

4    means that we were not in violation" —— are you going to take

5    that position at trial, likely?  Is there a distinct

6    possibility?

7                MR. PAULHUS:  That we will take the position that

8    affirmative defenses are applicable?

9                THE COURT:  Right.

10               MR. PAULHUS:  Yes, Your Honor.

11               THE COURT:  Okay.

12               MR. PAULHUS:  Assuming —— assuming that the —— that

13   the safe harbors are affirmative defense, which we don't

14   believe they are.

15               THE COURT:  Right.  Well, if they are and you're

16   taking that position, then why under *Cox* would that not be

17   taking an affirmative position that injects attorney—client

18   communications into the case, under *Cox*?

19               MR. PAULHUS:  Because we're not injecting into the

20   case an issue that has not already been put there by the

21   plaintiff.  The plaintiff has brought an Anti—Kickback Statute

22   and *Stark* law False Claims Act case, of which compliance with

23   the safe harbors and exceptions is a key component.  So we're

24   responding ——

25               THE COURT:  So just because the plaintiff —— you

```
 1   think that's what — you think you're going to convince Judge
 2   Carnes of that, that that's the distinction between this and
 3   Cox?
 4           MR. PAULHUS:  I do.  I think —
 5           THE COURT:  Didn't the same thing happen in Cox?
 6           I mean, in Cox they would not have had to raise
 7   lawfulness because they thought their conduct was lawful, if
 8   the plaintiff had not alleged it was unlawful.  I mean —
 9           MR. PAULHUS:  I think in this case the safe harbors
10   and exceptions are such a key component of the Stark and
11   kickback law that they are — they have been by definition put
12   at issue by the bringing of a Stark and kickback False Claims
13   Act case.
14           So I read Cox's rationale to be that when the
15   defendant puts an issue — brings a new issue to the case, they
16   then put themselves at risk potentially of waiver.  And that's
17   not the case in a Stark and kickback case, which is actually
18   integral to the plaintiffs' case.
19           THE COURT:  Well, let me just — let me just read a
20   portion of Cox and get you to distinguish this.  And you're
21   doing a fine job.  I just think you've got a difficult
22   challenge in light of Cox.  I mean, that's —
23           MR. PAULHUS:  Yes, Your Honor.
24           THE COURT:  I'm not being critical of you by
25   questioning you about this.  I don't think the — my — I don't
```

```
 1    think my response is because of poor lawyering.  I just think
 2    you've been handed a difficult chore this morning.
 3            MR. PAULHUS:  Understood, Your Honor.
 4            THE COURT:  On page 1418 of the decision, over under
 5    Subsection C, USX's attorney-client privilege, about — one,
 6    two, three, four, five, six, seven, eight, nine, ten, twelve —
 7    about eleven lines down, it says:  "Although USX" — meaning
 8    the employer there — "has denied any intent to assert a
 9    defense of advice of counsel or to rely on any privileged
10    attorney-client communications in its defense" — similar to
11    here — "the district court observed that USX's defense
12    necessarily implicates all of the information at its disposal
13    when it made the decision to change the leave-of-absence policy
14    and later to rescind the change.
15            "Reasoning that it would be inequitable to allow USX
16    to present evidence tending to show that it intended to comply
17    with the law, while allowing it to cloak its — in privilege
18    those documents tending to show that it might have known its
19    actions did not conform to the law, the district court held
20    that USX waived the attorney-client privilege with regard to
21    such communications.  USX argues that it was the plaintiffs who
22    injected the issue of USX's state of mind into the case by
23    including allegations of intentional criminal wrongdoing in the
24    complaint."  The same argument I think you just made.  "Because
25    29 U.S.C. 186, the criminal statute that the plaintiffs claim
```

1   USX violates, contains a component of willfulness, USX argues

2   that it has merely denied the plaintiff's allegations and that

3   a mere denial of *mens rea* should not constitute a waiver of the

4   attorney-client privilege."

5          That seems to be the argument that the defendants are

6   making here, and yet that is the very argument that Judge

7   Carnes rejected.  The mere fact that the plaintiffs have

8   alleged in their complaint a cause of action that has a *mens*

9   *rea* requirement of intent or knowing violation of the law —

10  which is not terribly different than willfulness — the mere

11  fact that they have done that does not mean under *Cox* that

12  they've injected something improperly into the case.  And it

13  does not mean that you, therefore, can hide behind the cloak of

14  the attorney-client privilege because of that.

15         So tell me how that language in *Cox* — how — and

16  you — how you distinguish that.

17         MR. PAULHUS:  So —

18         THE COURT:  I mean, that would be a heck of a

19  lawyering job.

20         How do you distinguish that?

21         MR. PAULHUS:  So, Your Honor, *Cox* points to this

22  criminal statute, and it later goes on to quote at some length

23  the *Bilzerian* case, which Ms. Bennett has mentioned.

24         The *Bilzerian* case is a criminal case, and this is a

25  clear criminal statute.  The rationale in *Bilzerian,* which was

 1    picked up on by the 11th Circuit, is that in this situation, if
 2    one wanted to deny intent, the way to do it is to rely on the
 3    high-intent bar and just say nothing — that "I deny that I had
 4    wrongful intent," as opposed to coming forward with some
 5    proactive statement.
 6             In our case we don't have that same level of ability
 7    to sort of view this as a criminal violation, as is the case
 8    with that 186.  So as a defendant, I don't have the same
 9    realistic option to say, "Well, I did not have that level of
10    criminal intent required to violate that statute.  Accordingly,
11    I'm going to sit back and say nothing."  I have to respond to
12    discovery, and I have to explain why we didn't have the
13    wrongful intent under the situation.
14             THE COURT:  Why didn't — *Cox* is a civil case.  Why
15    did they not have that same obligation that you — or
16    compulsion that you have here?
17             Why — I don't understand how you're situated
18    differently than CSX, except for this quote, "complexity-of-
19    the-law exception to *Cox*."  I mean, it seems to me that you're
20    pretty closely situated to that — to what I just stated.
21             MR. PAULHUS:  I think our response would be that the
22    fact — the court seemed to take it to be important that this
23    was a criminal statute.  It in turn — it's a predicate act for
24    the RICO violation, which is the criminal statute, which it
25    then cites at length from *Bilzerian*.  So why is the Court

1     citing a criminal statute in this civil case.

2              I think — my reading is that it fails at the level

3     of intent required to establish this RICO predicate, under the

4     Bilzerian rationale, that they said, "Well, you could just deny

5     the intent and that that's not going to — that you could stop

6     there."  But in our case I think we have a different situation,

7     where it's more difficult for us to deny a high level of

8     intent, because we don't — we have a lower level of intent

9     that is associated with the False Claims Act.

10             We don't have a criminal predicate — well, we do

11    with the kickback statute, but it's not in particular with the

12    False —

13             THE COURT:  But you could — and regardless of

14    whether it's criminal or not, you could deny that you knowingly

15    violated the *Stark* law or the Anti-Kickback Statute.

16             MR. PAULHUS:  That's correct.

17             THE COURT:  You could do that.

18             MR. PAULHUS:  That's right.

19             THE COURT:  How do you describe this distinction that

20    Judge — that the Court of Appeals seems to make between, okay,

21    if you just deny it, you're okay; but if you — if you say —

22    if you go forward, "I think I followed the law," you're not

23    okay?

24             How do you explain that distinction?  What do you

25    think he's saying?

1          MR. PAULHUS:  I don't think that there's a

2    distinction there, Your Honor.

3          THE COURT:  What do you think he's saying, though?

4    When he's — what do you think the opinion's saying?

5          When it says:  "In similar — in the present case,

6    USX could have denied criminal intent without affirmatively

7    asserting that it believed its change in pension fund policy

8    was legal.  Having gone beyond mere denial affirmatively to

9    assert good faith, US injected the issue of its knowledge of

10   the law into the case and thereby waived the attorney—client

11   privilege."

12         What is your interpretation of that paragraph in the

13   opinion?

14         MR. PAULHUS:  I —

15         THE COURT:  How does that work in the real world?

16         MR. PAULHUS:  I don't think it works particularly

17   well in the civil context.

18         THE COURT:  Well, that's what *Cox* was.

19         MR. PAULHUS:  I understand that.

20         THE COURT:  You keep wanting to say it's criminal,

21   but Cox it's civil.

22         MR. PAULHUS:  That's correct; although, it has —

23         THE COURT:  I mean, what do you think that means?

24         You're trying to advise a client on that.  What does

25   that mean?  Does it mean what Ms. Bennett says, that — to not

```
 1    waive privilege, all you can do is just say deny the
 2    allegations?
 3              MR. PAULHUS:  You know, I'm not sure how that would
 4    work in practice in a civil case when — when witnesses are
 5    deposed.  We will be asked did you — "Did you have the intent
 6    to violate the statute," which is an example that we provided
 7    in our brief.  We said — and I think the answer is, "No, I did
 8    not intend to violate the statute."  We would not trip into any
 9    kind of a waiver.  Under Ms. Bennett's theory —
10              THE COURT:  But if she slips up and she says, "I
11    didn't intend to violate the statute, I thought I was following
12    up with — I thought I was following the law," then we get into
13    Cox.
14              Are they able to explore all that with her, what
15    she — like explore what she talked to her attorneys about?
16              MR. PAULHUS:  And I — I don't believe that —
17              THE COURT:  That's just — that seems —
18              MR. PAULHUS:  I don't —
19              THE COURT:  That seems a slender read upon which to
20    breach the attorney-client privilege, but I — but that
21    argument's got to be made to the 11th Circuit, and you've got
22    to get a panel that — you're — well, you're going to have to
23    be heard en banc, because another three-judge panel can't
24    change Cox.
25              MR. PAULHUS:  So I think, Your Honor, the reason that
```

1    I don't think *Cox* is determinative in *Stack*, reading *Cox* for

2    such a comprehensive and broad rule, in light of an abuse of

3    discretion affirmance and in light of the fact that I think you

4    need to take a look at each specific factual situation — which

5    *Cox* did — in part looking at the union first and then looking

6    at USX's privilege issues, I think you need to look at each

7    individual fact or situation of what facts — what exact

8    assertions are being made by the defendant, whether that puts

9    something at issue.  And I don't think that you can just expand

10   it to have a wholesale waiver anytime someone denies intent and

11   says, "I think I complied with the law."  I don't read *Cox* to

12   be as broad and to have a comprehensive rule to that effect.

13           THE COURT:  All right, I'm about — I'm about To the

14   end, but — in *Cox*, the 11th Circuit concluded that it would

15   have been unfair not to allow the plaintiffs to discover the

16   attorney-client information, based upon the defendant taking

17   the position that it thought its — in good faith that its

18   actions were lawful.

19           How could it be unfair there, under those

20   circumstances, not to allow that information to be discovered

21   and it not be unfair here under these circumstances, on the

22   issue of fairness?

23           MR. PAULHUS:  I think — I think one needs to look at

24   the underlying elements of the claim that are being pled.  And

25   here whether or not the defendants understood that they were in

 1   compliance with the *Stark* law or the Anti-Kickback Statute are

 2   clearly a component of the case that have been put at issue by

 3   the plaintiff.  And so it's hard to understand how it would be

 4   unfair to have a witness have to answer questions and explain

 5   why they believed that they acted consistent with the law that

 6   they're alleged to have violated.

 7           THE COURT:  Well, how is it unfair for them not to be

 8   able to test that, what that witness says?

 9           In other words, let's just assume -- I'm not

10   suggesting this is out there.  But let's assume that counsel

11   before this transaction advised representatives of the hospital

12   that, you know, "This is close to the line, and I am very

13   concerned that if we do this there could be a violation of the

14   Anti-Kickback Statute or the *Stark* law" -- well, let's say that

15   it was even stronger than that.

16           Let's say they said, "Y'all can't do this.  It's

17   against the law."  And somebody at Columbus Regional said, "I

18   don't care.  It's going to make us a lot of money."  And let's

19   assume that that's what happened.  And let's assume on the

20   witness stand these same executives get on the stand and they

21   say, "Jury, we thought we were following the law.  Based on our

22   years of experience and based on our sophistication and based

23   on us keeping up with the factors you consider under the *Stark*

24   law and the -- and the Anti-Kickback Statute, we thought this

25   complied with the law, and you should trust us on that."

1            Why is it not unfair if the —— for the plaintiffs not

2    to be able to find out whether there is information showing

3    that what they're saying on the witness stand is not fully

4    supported?  Why —— on the —— just on the fairness part of it.

5    That's what I'm talking about, on the fairness.

6            MR. PAULHUS:  Right.  In that scenario, I think —— I

7    think it's a question of relevance, is that relevant to whether

8    what they're saying is true or not.  And I think in that case

9    the answer is that this is a case where the law would protect

10   the privilege, understanding the broader silent act of

11   encouraging people to seek counsel on the front end, realizing

12   that once they do take an affirmative step to waive that

13   privilege, it will be protected.  If ——

14           THE COURT:  I'm still not understanding —— and you ——

15   I know you've said it, and I guess it's just kind of bouncing

16   off of me.  But what was the affirmative step in *Cox*?  Let's

17   just get that precisely stated.  What is your interpretation of

18   the affirmative step that was taken in *Cox* that injected it

19   into the —— that was injected that allowed for the waiver of

20   the privilege?  What was the affirmative step?

21           As you say here, y'all aren't taking an affirmative

22   step.  What was the affirmative step in *Cox*?

23           MS. BENNETT:  Your Honor, are you asking ——

24           THE COURT:  No, no.  I'm asking —— you're going to

25   have a shot.  You've already had a shot.

```
 1              MR. PAULHUS:  If you'll give me just a moment, Your
 2    Honor.
 3              THE COURT:  I think the fact that we don't know it
 4    off the top of our head is indicative of the difficulty of
 5    distinguishing Cox.  I think y'all believe Cox was wrongly
 6    decided, but you know that this is not the place to make that
 7    argument.
 8              MR. PAULHUS:  I believe that, Your Honor, if — if
 9    Cox is read as broadly as the plaintiff suggests, then I would
10    suggest that there are troubling downstream consequences of
11    that —
12              THE COURT:  There are no doubt — listen, there are
13    troubling consequences as it relates to the attorney-client
14    privilege, but those troubling consequences may be the law.
15              MR. PAULHUS:  I guess —
16              THE COURT:  But, again, I — I keep interrupting you.
17              What is the affirmative step that you believe was
18    taken in Cox?
19              Wasn't it just them saying that we had a good faith
20    belief that our conduct was lawful?  Wasn't that —
21              MR. PAULHUS:  Your Honor, earlier I raised some
22    points that I picked up in the briefing, which I'd be happy to
23    share with you —
24              THE COURT:  No, I want to know what your position is
25    with regard to the — you said previously that here we did not
```

1    take an affirmative step to inject this into the case.  I'm

2    trying to figure out your position with regard to what was the

3    affirmative step that USX took in *Cox*.

4           MR. PAULHUS:  In *Cox,* there was an issue of an

5    inadvertent waiver of certain memos by the USX in-house

6    counsel —

7           THE COURT:  No.  In the opinion.  In the opinion —

8           MR. PAULHUS:  That's not —

9           THE COURT:  In the opinion what does the Court of

10   Appeals say was the affirmative step that injected the issue

11   into the case such that there was waiver?

12          That's what I'm — I'm asking you what would Judge

13   Carnes and — well, and Judge Anderson.  He's still on the

14   court.  What would they say was the affirmative step taken

15   there in *Cox*?

16          MR. PAULHUS:  Well, they start off the section,

17   Section C, indicating that the proceedings before the district

18   court, USX has consistently taken the position that it was

19   implemented and believed this policy to be lawful.

20          THE COURT:  There you go.

21          MR. PAULHUS:  Right.

22          THE COURT:  That was the affirmative step.

23          MR. PAULHUS:  Right.

24          THE COURT:  The plaintiff contends that the

25   affirmative step you took here was taking the position that you

 1   thought your position — that you thought the conduct was

 2   lawful.

 3          Now, that's the difficulty with distinguishing *Cox*.

 4   And you've done an excellent job of trying to do it, and I'm

 5   going to go back and look at it again, because — I mean, my

 6   hands are appropriately tied that I've got to follow *Cox*

 7   obviously.

 8          Let me ask you this — and I'm not saying *Cox* is

 9   wrong.  I don't want that to be on the record, that I think

10   Judge Carnes was wrong.  I'm just saying that it — well, I'll

11   just leave it at that.

12          MR. PAULHUS:  Your Honor —

13          THE COURT:  Is there a — yes, sir.

14          MR. PAULHUS:  I was just going to say I think that

15   the key fact about *Cox* is that it's an abusive discretion

16   standard that was being applied, and the Court of Appeals is

17   ruling on the district court's actions.

18          THE COURT:  Well, that was one thing I explored with

19   Ms. Bennett, is — would it have been an abusive discretion if

20   the district judge there had not allowed them to obtain the

21   materials.  In other words, is this one of those situations

22   where it could have been affirmed either way.  Ms. Bennett, of

23   course, argues that the rationale supporting the holding is so

24   clear that it would have been an abuse of discretion if that

25   district judge there had not found waiver.

1          MS. BENNETT:  Your Honor, I'd like to add to that by

2     saying that before — when this issue came up to the 11th

3     Circuit in *Cox,* it was an issue of first impression.  So the

4     question the Court has to ask itself is not whether it was an

5     abusive discretion now but whether the 11th Circuit would say

6     it is now — given that we've set a bright-line rule in *Cox,* it

7     was an abusive discretion for the district court to deny the

8     relator access to attorney-client privilege, which in fairness

9     they should have because of the defense injection into the case

10    of an issue that goes beyond denying intent —

11          THE COURT:  Is it not surprising to you at all

12    that — on an issue this significant that — where you would

13    think would apply in other contexts, that there has never been

14    a citation of this decision in any other 11th Circuit opinion

15    on this proposition?

16          MS. BENNETT:  Your Honor, I think that as I said at

17    the beginning, this is very settled law and has been for 20

18    years —

19          THE COURT:  Okay, so nobody's contested — so these

20    guys are the only ones that are even attempting to — I mean,

21    have you faced this in other cases, where the other side just

22    doesn't even oppose the turning over of attorney-client

23    documents?

24          MS. BENNETT:  I'm not saying that, Your Honor.  I

25    think in every situation a defendant wants to get an order from

| | |
|---|---|
| 1 | the court before they take that step.  I've never had —— in a |
| 2 | meet–and–confer, I've never had a defendant's attorney say, |
| 3 | "Oh, yeah, you can have" —— |
| 4 | THE COURT:  Okay. |
| 5 | MS. BENNETT:  —— "my attorney–client privileged |
| 6 | documents. |
| 7 | But I think the issue is so well–settled it just |
| 8 | doesn't —— |
| 9 | THE COURT:  And you know —— and your contention is |
| 10 | there are no cases in the 11th Circuit, district judge cases, |
| 11 | that would support not applying *Cox* under these circumstances? |
| 12 | MS. BENNETT:  I have not seen any. |
| 13 | THE COURT:  Do you know of any? |
| 14 | MR. PAULHUS:  I do, Your Honor. |
| 15 | THE COURT:  In this circuit? |
| 16 | MR. PAULHUS:  Yes, Your Honor. |
| 17 | THE COURT:  Okay.  Did you cite them in your brief? |
| 18 | Go ahead and cite them —— |
| 19 | MR. PAULHUS:  Just let me —— let me —— |
| 20 | THE COURT:  —— now just in case they're not in your |
| 21 | brief. |
| 22 | MR. PAULHUS:  I just want to —— you've asked the |
| 23 | question several times, Your Honor, are we aware of any 11th |
| 24 | Circuit cases that apply *Cox* to similar situations.  I am aware |
| 25 | of one case. |

```
 1              THE COURT:  Okay.
 2              MR. PAULHUS:  And that case is the Seres Marine
 3    Terminals case.
 4              THE COURT:  Is that cited in your brief?
 5              MR. PAULHUS:  I do not believe it is.
 6              THE COURT:  Seres Marine ——
 7              MR. PAULHUS:  S-E-R-E-S, Marine Terminals, 2013.
 8              THE COURT:  What's the cite?
 9              MR. PAULHUS:  I apologize.  I do not have the cite at
10    hand at the moment.
11              THE COURT:  You've just got the name of the case?
12              MR. PAULHUS:  That is the name of the case, Seres
13    Marine.
14              THE COURT:  But that's all you've got?
15              MR. PAULHUS:  Versus Office Worker's Comp.
16              THE COURT:  Okay.  And is that a published opinion?
17              MR. PAULHUS:  It is not a published opinion.
18              THE COURT:  Okay.  Do you have any ——
19              MR. PAULHUS:  The description there, Your Honor, is
20    administratively ——
21              THE COURT:  You don't have the civil action number or
22    any —— all you've got is just the name?
23              MR. PAULHUS:  I will —— in fact, I will get it for
24    you.
25              THE COURT:  I take it this is a case you handled?
```

1             MR. PAULHUS:  It is not, Your Honor.

2             THE COURT:  Okay.  You just — all right.

3             MR. PAULHUS:  I have it — I have it in my brief bag,

4    if you'd — I'll provide that for you in a moment, if you don't

5    mind.

6             THE COURT:  Okay.  That will be fine.

7             MR. PAULHUS:  The Seres Marine case is an

8    administrative proceeding in front of an ALJ, in which a party

9    put an earlier report of an expert at issue in the case and

10   then tried to withhold a later report comment by the same

11   expert.  And the court concluded that even though the later

12   representation was inconsistent with the prior representation

13   by the same expert, the court found that that was a situation

14   in which the issue had been joined or it — the issue in the

15   second document that was trying to be withheld had been put at

16   issue by statements affirmatively made in the case.  And so the

17   court felt it was unfair to not allow the later inconsistent

18   opinion to come in.

19             THE COURT:  And it cited *Cox?*

20             MR. PAULHUS:  It does.

21             THE COURT:  Okay.

22             MR. PAULHUS:  And that, Your Honor —

23             THE COURT:  I'd be interested — I think we can

24   probably find it based upon your statement of the case — you

25   say it's an unpublished opinion that was rendered in 2013?

```
 1              MR. PAULHUS:  2013, uh-huh.
 2              THE COURT:  Okay.  I think that's all we need on that
 3    case.
 4              MR. PAULHUS:  Okay.  And —
 5              THE COURT:  What about district court cases that
 6    under similar circumstances have reached a different result
 7    than —
 8              MR. PAULHUS:  I would say that I found three or four
 9    district court opinions that discuss Cox on similar — or in
10    this context.  One is Taylor v. Nix, which is citing — cited,
11    I believe, in the briefing.
12              THE COURT:  Okay.
13              MR. PAULHUS:  And Taylor v. Nix finds Cox to be in
14    opposite.  There was no injection of the issue by reference to
15    the documents.
16              THE COURT:  Okay.
17              MR. PAULHUS:  There's another case, United States v.
18    Mackie.  It's a criminal case in which there was an injection
19    of good faith knowledge of the law into the case.  And
20    Ms. Bennett cites this in her briefing.  That was an
21    alternative holding, and it's also in the criminal context,
22    which I think is distinguishable here.
23              THE COURT:  I'm interested in district court cases
24    that are favorable to you.
25              MR. PAULHUS:  I was highlighting this for you, Your
```

1    Honor, to explain that.  I think that there are at most a
2    handful of decisions in the last 20 years that pick up on *Cox,*
3    and I believe they're all clearly distinguishable, and they all
4    seem to me to present issues in which the other — the person
5    who is alleged to have waived or had an act of implied waiver
6    has actually taken some affirmative step to put forward
7    evidence or testimony by a witness —
8              THE COURT:  Are there any — have you found any
9    district court cases in the 11th Circuit that have discussed
10    *Cox* and have then concluded that *Cox* is distinguishable and,
11    therefore, these attorney — that we find that the — they have
12    not waived the attorney—client privilege?
13              MR. PAULHUS:  *Taylor v. Nix* is a case that indicates
14    that *Cox* is an opposite, that there was not an injection of the
15    issue by reference —
16              THE COURT:  That's the only one, though?
17              MR. PAULHUS:  That's correct, Your Honor.
18              THE COURT:  Okay.  What would be — and you may have
19    no response to this.  What would be your view as to why *Cox* has
20    not been cited by the 11th Circuit, except in this 2013 case,
21    for 20 years that — Ms. Bennett takes the position it's just
22    so well—settled nobody's litigated that.
23              MR. PAULHUS:  Right.
24              THE COURT:  Is that — I take it that wouldn't be
25    your view?

1            MR. PAULHUS:  That is not my view, Your Honor.  I
2   suspect that the — well —
3            THE COURT:  You think they're not — the issue is not
4   bubbling up to the Court of Appeals because it's a discovery
5   issue or —
6            MR. PAULHUS:  I think that it's certainly not a
7   well-settled issue.  I think that the 11th Circuit may read its
8   own opinion to be tightly focused on the facts of that case
9   because it was an abuse of discretion standard, and that one
10  would think that if it had issued the broad rule for which
11  Ms. Bennett cites it, that it would be cited extensively and
12  the 11th Circuit would be a venue of choice for a False Claims
13  Act plaintiffs to secure — for those documents.
14            THE COURT:  If you lose on the motion — if I grant
15  the motion to compel, do you have an opportunity to have that
16  ruling reviewed interlocutory?
17            MR. PAULHUS:  Your Honor, we have two options under
18  the Supreme Court's recent decision in the *Mohawk* case.  We
19  have — we can ask you to certify the case to the 11th Circuit
20  under 1292(b) or we could seek a *mandamus* action from the 11th
21  Circuit.  Those are our options.  Or we could take the contempt
22  (phonetic) citation, which I don't think we would do.
23            THE COURT:  Okay.  So there is at least an
24  opportunity for you to ask the 11th Circuit to take a look at
25  this?

```
 1              MR. PAULHUS:  That's correct, Your Honor.
 2              THE COURT:  Okay.  And if I were to grant the motion
 3    to compel and were to order you to produce any communications
 4    involving the attorney and the client that relate to the
 5    lawfulness or legality of these transactions that form the
 6    basis of the False Claims Act — can't claims — is that
 7    sufficiently definite for you to know what to produce or is
 8    there — would there be a need for the Court to review certain
 9    documents in camera to determine whether the documents relate
10    to the legality of the transaction?
11              MR. PAULHUS:  I think if the — if the ruling were
12    very specific as to the transaction at issue, we — there might
13    be documents that would require an in camera review.
14              THE COURT:  I mean, what is — what is y'all's view
15    of — if I grant the motion, is the best way — and I don't
16    know that I am — but if I did, is the best way to grant it for
17    me to order you to produce them for an in camera review or is
18    that — keeping in mind that the last thing the Court — a
19    judge wants is to unnecessarily have to review a lot of
20    documents.
21              MR. PAULHUS:  Right.
22              THE COURT:  But would it be your position that that
23    would be necessary or not or have you thought about it?
24              MR. PAULHUS:  I've not thought about that, Your
25    Honor.
```

1          THE COURT:  Okay.

2          What do you think about that, Ms. Bennett?  You have

3  no idea because you don't know what the documents show, but —

4          MS. BENNETT:  Well, I have experience in this, and I

5  have — the experience I have is that the defendant has been

6  able to identify from the court in the *Salvadore* case, which

7  was in front of Judge Totenberg.  The defendant seemed to have

8  no problem identifying the documents that —

9          THE COURT:  All right, well, I think that if I grant

10  the motion, I'll grant it just as a standard granting of a

11  motion and would describe what needs to be produced.  And then

12  if there's some concern about certain documents, then you could

13  make a motion that I review those *in camera.*  But understanding

14  there just wouldn't be a blanket request that the Court review

15  all these documents *in camera.*

16          MR. PAULHUS:  That's correct, Your Honor.

17          THE COURT:  Okay.

18          MR. PAULHUS:  Your Honor, may I —

19          THE COURT:  Yes, sir.

20          MR. PAULHUS:  — make one comment?  It —

21          THE COURT:  I'm going to let you do this.  I'm going

22  to let — I'm going to let Ms. Bennett make a short — a very

23  short — less than five minutes — conclusion, if she wants to

24  make a wrap-up conclusion, and then I'll let you make a five-

25  minute wrap-up response and we'll be done.

1           MR. PAULHUS:  Thank you, Your Honor.

2           THE COURT:  Okay.

3           All right, Ms. Bennett.

4           MS. BENNETT:  Your Honor, yes, I just want to make a

5    few brief points, and there are a couple of issues that were

6    raised in your colloquy with defense counsel that I want to

7    make the relator's position clear on.

8           I think that the issue of who has the burden of proof

9    as to the affirmative defenses of compliance with safe harbors

10   is an issue we need to brief to the Court.  I think my position

11   is that the — and I think the case law supports this — is

12   that the relator has to prove that there was a remuneration

13   relationship —

14          THE REPORTER:  I'm sorry.

15          MS. BENNETT:  That there was a re — I can hardly say

16   it — a compensation relationship — in other words, that money

17   was involved — that the transaction wasn't at fair market

18   value or commercially reasonable.  And then the defendant has

19   the burden of proof to show in compliance with the safe harbor.

20   That's our position, and we would like just to put on the

21   record now that we hope the Court won't make any assumptions

22   about where the burden of proof lies until we have an

23   opportunity to brief that.

24          THE COURT:  Well, your position was I don't need to

25   decide that to decide this motion to compel; correct?

1          MS. BENNETT:  I don't think so, Your Honor ——

2          THE COURT:  All right.  Go ahead.

3          MS. BENNETT:  —— but I just wanted to make sure I

4    didn't waive any objections by ——

5          THE COURT:  All right.

6          MS. BENNETT:  —— not saying anything.

7          And then the other issue I would like to place before

8    the Court is the fact that —— what my concern is, if the Court

9    were to deny the defendants' motion —— I'm sorry —— deny the

10   relator's motion —— excuse me —— the issue that has come up in

11   my cases as a practical matter is whether the defendant is

12   actually going to assert the advice-of-counsel defense.  And I

13   found that as a case management issue and logistically that's

14   something that we need to decide now.

15         So the —— I know that ——

16         THE COURT:  I thought that —— let me just ask you

17   this.

18         Mr. Paulhus, have you not affirmatively stated in

19   filings with this court that you do not intend to assert a ——

20         MR. PAULHUS:  That's correct, Your Honor, we do not

21   intend to assert an advice-of-counsel defense.

22         THE COURT:  Well, let me ask you this before you get

23   stuck with something you later have to retract.

24         If I grant the motion to compel and, thus, you have

25   to produce all of the information anyway, and if there's

 1   information there where counsel says, "I think this is okay,"

 2   then I'm assuming under that circumstance you'd want to assert

 3   that?

 4           MR. PAULHUS:  That's correct, Your Honor.  We would

 5   have a different view at that point.

 6           THE COURT:  Okay.

 7           MS. BENNETT:  That's my point, Your Honor.

 8           THE COURT:  That all makes sense to me that — I

 9   mean, the risk — I don't know if it's a risk, but the risk the

10   plaintiff runs, I guess, of pursuing the documents is if you

11   don't find the — the smoking gun and you find all this

12   correspondence where counsel has said, "Oh, yeah, I think this

13   is legitimate and legal," then I guess they'll be able to do

14   that — I guess your assumption is if that's all there was that

15   they wouldn't be fighting your motion to compel.

16           MS. BENNETT:  Yes, Your Honor.

17           THE COURT:  Okay.

18           MS. BENNETT:  I would assume they'd send that to me

19   on a silver platter.

20           THE COURT:  Okay.  Well, as I understand it, you

21   reserve — if I — if I deny the motion to compel, the

22   defendants do not intend to raise an advice-of-counsel defense.

23           Is that correct?

24           MR. PAULHUS:  That's correct, Your Honor.

25           THE COURT:  But if I grant the motion to compel,

 1    you're reserving the right to assert that defense?

 2              MR. PAULHUS:  That's correct, Your Honor.

 3              THE COURT:  Okay.

 4              MS. BENNETT:  Your Honor ——

 5              THE COURT:  The record's clear on that.

 6              MS. BENNETT:  Yes, it is clear, but I want to raise

 7    that as a logistical and case management issue in terms of

 8    when.  When are we going to learn that?  Because I assume

 9    what's going to happen after today is that the Court is going

10    to issue a ruling granting or denying the motion, we're going

11    to go immediately back into taking depositions.  We want to get

12    the discovery done.  And I don't want to take 12 depositions

13    and then right before trial, or whatever, "Oh, we decided we're

14    going to assert the advice-of-counsel defense, and I'm —— I'm

15    prejudiced because I've already completed my discovery.  Do I

16    go back and take depositions?  Does it add another delay?

17              I would request that the Court set a deadline for

18    this defendant to make that election and that it be soon,

19    before we go back into deposition.  This has happened in many

20    of our cases, where it's been sprung on us at the last minute,

21    and it's —— the courts generally don't like it, and it wreaks

22    havoc in our —— in our discovery.

23              THE COURT:  Well, I —— my understanding would be that

24    if I grant the motion to compel, where I'm allowing you to

25    discover this attorney-client privilege, then you would also

1   have the right to discover information relating to the advice-
2   of-counsel defense unless they affirmatively say, "We're
3   waiving the defense."

4          So I would think, if I grant the motion to compel,
5   you would proceed as if they are going to assert that defense.
6   And then the — if they don't want you to proceed in that area,
7   then they can affirmatively state, "We're not asserting the
8   defense."  And then if it's ambiguous at that point, something
9   can be brought to my attention.

10          MS. BENNETT:  Thank you, Your Honor.

11          THE COURT:  But — okay, I think that's the clearest,
12   cleanest way to handle it.

13          MS. BENNETT:  Yes, Your Honor.

14          THE COURT:  All right, go ahead.

15          MS. BENNETT:  Well, the only point I really wanted to
16   make is that the — and I think the Court understands this —
17   is that the defendant is oversimplifying the *Cox* case and
18   trying to make the argument that *Cox* shouldn't apply in the
19   health care arena because it's so complicated.

20          But my experience is that RICO is extremely
21   complicated.  As I said before, I've tried RICO cases, and
22   they're not easy.  And also that the *Cox* case in particular was
23   complicated by the fact that the decision about whether the
24   defendant violated the underlying bribery statute called into
25   issue many other questions about what ERISA requires, what

```
1   labor union management law requires.  And those are all equally
2   complex.  I've dabbled a little bit in labor law, and the
3   regulations are just as complicated as in health care.  And I
4   don't think you can draw a distinction based on that alone.
5            THE COURT:  All right.
6            MS. BENNETT:  And the fact of the matter is I also
7   think the Court understands this; that in the False Claims Act
8   arena, where there's an allegation of a violation of the
9   Anti-Kickback Statute, there is a -- there is a -- the AK --
10  I'm sorry -- the AKS is an underlying criminal statute, and
11  there is a heightened burden of proof with respect to a civil
12  violation because the underlying violation is criminal.
13           THE COURT:  I understand that.
14           MS. BENNETT:  Yes, that's all I wanted to add, Your
15  Honor.
16           THE COURT:  It seems to me -- what would your
17  position be if they sought a certificate of immediate appeal?
18           MS. BENNETT:  If they sought it --
19           THE COURT:  A certificate from me that this should --
20  that -- I mean, I assume that's one way they could appeal
21  interlocutory, if I provided a certificate, that this -- what
22  is appropriate for an interlocutory review.
23           What's your position on that?
24           MS. BENNETT:  I think we would oppose that.
25           THE COURT:  Okay.
```

```
 1              MS. BENNETT:  But understanding that that could
 2    happen and significantly delay the case ——
 3              THE COURT:  Right ——
 4              MS. BENNETT:  —— we're willing to address that.
 5              THE COURT:  —— delay is the problem.
 6              MS. BENNETT:  It's always a problem.  But we're
 7    willing ——
 8              THE COURT:  Well, it think it would ——
 9              MS. BENNETT:  —— to take that risk.
10              THE COURT:  It would —— it would be helpful —— well,
11    I don't —— "helpful" is the wrong word.
12              I'm sure the defendants would like for the Court of
13    Appeals to be able to review this issue in a case that is not
14    cluttered with all the other things that existed in Cox.  I
15    mean —— so that this is the central —— I'm not saying that
16    wasn't —— this wasn't a key issue in Cox.  But in reading that
17    opinion and —— there were a lot more words spent on the RICO
18    statute and the intricacies of the RICO statute —— I'm not
19    suggesting that that —— that anybody got it wrong, but it would
20    be —— it could advance the law if the court focused just on
21    this issue in a case and either came down and said, "We told
22    you what we said in Cox and that's —— and we meant it," and ——
23    or not.  But anyway.
24              MS. BENNETT:  We're willing to take the risk of that.
25              THE COURT:  Yes, I'm sure you are.
```

1           Okay, you want to close?

2           MR. PAULHUS:  Yes, Your Honor.

3           So, to be — to be clear, we recognize that *Cox* is

4   hard to distinguish, but we do not view it as a bright-line

5   test.  It was an abuse of discretion case.  As you say, there

6   were a lot of other facts swirling around in *Cox.*  We also note

7   that it's rarely cited for the broad proposition that the

8   plaintiffs suggest.

9           Our view is that if there is a broad exception read

10  into *Cox,* it would really swallow the rule of privilege on any

11  case that includes intent, not just a False Claims Act case.

12  And in particular we think that this is inconsistent with the

13  Supreme Court's view of the sanctity of the privilege.

14  Recognizing a quote that I think is important from Upjohn is

15  that "An uncertain privilege or one which purports to be

16  certain but results in widely varying application is little

17  better than no privilege at all."  And that's our concern here,

18  that if *Cox* is read more broadly than it — than it seems to be

19  on its face.

20          Thank you, Your Honor.

21          THE COURT:  All right.  Thank you for coming.

22          I — my plan is to get out a written order prior to

23  Friday week.  And it could be — it could be sooner than that,

24  but I've got a — my jury trial term starts September the 2nd.

25  So I'm going to get out a written order on this before that so

1  that you should get something back from me on this no later

2  than Friday — Friday week.

3          MS. BENNETT:  Thank you, Your Honor.

4          THE COURT:  Okay.  Thank y'all for coming.  We're

5  adjourned.

6      (Proceedings concluded at 12:12 p.m.)

7                    CERTIFICATE OF REPORTER

8

9      I, Alan M. Causey, Certified Court Reporter, in and for

10  the State of Georgia, do hereby CERTIFY that the foregoing

11  proceedings were reported by me in stenographic shorthand and

12  were thereafter transcribed under my direction into

13  typewriting; that the foregoing is a full, complete, and true

14  record of said proceedings.

15

16                          This 22nd day of August, 2014.

17

18                    _____

19                          s/Alan M. Causey, CCR

20

21

22

23

24

25