```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
                       COLUMBUS DIVISION

UNITED STATES OF AMERICA ex    *
rel. RICHARD BARKER, et al.,
                               *
     Plaintiffs,
                               *
vs.                                   CASE NO. 4:12-CV-108 (CDL)
                               *
THOMAS J. TIDWELL, et al.,
                               *
     Defendants.
                               *
```

O R D E R

In this *qui tam* action, Relator Richard Barker alleges that Defendant Thomas J. Tidwell submitted false claims to the United States and Georgia in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and the Georgia Medicaid False Claims Act, O.C.G.A. §§ 49-4-168 to 168.6.  First, Barker contends that Dr. Tidwell submitted Medicare and Medicaid claims for intensity modulated radiation therapy ("IMRT") even though the treatment Dr. Tidwell provided to his patients was not IMRT.  Second, Barker argues that Dr. Tidwell falsely certified that he was in compliance with the Anti-Kickback Statute to get his Medicare and Medicaid claims paid even though he violated the Anti-Kickback Statute.  Third, Barker asserts that Dr. Tidwell violated the Stark Law, which prohibits Medicare claims for services furnished at a treatment facility pursuant to referrals

from a physician who has a financial relationship with the facility.

Dr. Tidwell argues that there is no evidence that he knowingly submitted any false claims, and he seeks summary judgment on all of Barker's claims against him. As discussed below, there is a genuine fact dispute on whether Dr. Tidwell knowingly submitted false claims in connection with his IMRT billings. There is also a genuine fact dispute on whether Dr. Tidwell knowingly violated the Anti-Kickback Statute. Therefore, Dr. Tidwell's summary judgment motion (ECF No. 80) as to those claims is denied. Dr. Tidwell's summary judgment motion as to Barker's Stark Law claim, however, is granted because Dr. Tidwell presented evidence that his services were provided pursuant to a consultation exception to the Stark Law, and Barker did not present any evidence to create a genuine fact dispute on this point.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in

the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Barker, the record reveals the following.

Dr. Tidwell is a radiation oncologist. He owned the Tidwell Cancer Treatment Center, a free-standing radiation oncology clinic in Columbus, Georgia. His wife, Eve Tidwell, managed the Treatment Center. In 2002, the Treatment Center purchased "DynART" radiation oncology equipment from a company called 3-D Line. 3-D Line told the Tidwells that DynART performed intensity modulated radiation therapy and that DynART satisfied the requirements for billing IMRT under Medicare.[1]

---

[1] Barker contends that this fact statement should not be considered because it is actually a legal conclusion. It is not. It is a fact statement about what 3-D Line told the Tidwells during 3-D Line's sales pitch for the DynART equipment. Barker also asserts that Mrs. Tidwell's declaration on this point is inadmissible. Barker argues that Mrs. Tidwell offers an improper opinion regarding Dr. Tidwell's state of mind and that her testimony contains inadmissible hearsay. But Mrs. Tidwell did not offer any opinion regarding Dr. Tidwell's state of mind. Rather, she explained what a vendor told the Tidwells to induce them to purchase radiation therapy equipment for the Treatment Center. While this testimony may be circumstantial evidence of Dr. Tidwell's state of mind, it is certainly not an opinion about Dr. Tidwell's state of mind. And, if the evidence is not offered to prove the truth of the matter asserted (that the DynART actually performs IMRT) but is instead offered to explain what the Tidwells believed and why they purchased the DynART equipment for the Treatment

Tidwell Decl. ¶ 4, ECF No. 83. The DynART system used treatment planning software, and the Tidwells installed updates over the years to keep the system current. *Id.* ¶ 5. The Treatment Center billed Medicare and Medicaid for IMRT based on treatment provided to patients using the DynART system. In 2006, 2008, 2010, and 2011, the Treatment Center's billing practices were audited by external auditors. *Id.* ¶¶ 6-8, 10. The auditors did not raise any concerns about the fact that the Treatment Center billed Medicare and Medicaid for IMRT based on treatment provided using the DynART system. *Id.*

Evidence does exist, however, which, if believed, arguably contradicts the Tidwells' contention that they believed the DynART system performed IMRT. For example, when a company called Oncology Solutions evaluated the Treatment Center's equipment in 2010, it found that the Treatment Center's equipment was not "competitive with current standard-of-care models" and would need to be replaced. Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 10, Mem. from Jake A. Jones III to Donald E. Elder (June 24, 2010), ECF No. 95-11; Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 7, Email from Eve Tidwell to Matt Sherer (Jan. 31, 2011), ECF No. 95-8 (acknowledging that others had concluded that it was malpractice to treat patients using the

---

Center, then it is not hearsay within the meaning of Federal Rule of Evidence 801(c).

4

Treatment Center's equipment); *see also* Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 11, Chisela Report (Jan. 2, 2013), ECF No. 95-12 (finding that the Treatment Center's equipment was "not capable of supporting radiation treatment of cancer patients to meet minimum acceptable standards of care"). Given this conflicting evidence, the Court finds that a genuine factual dispute exists as to whether the Tidwells believed that the DynART system performed IMRT.

In 2010, Columbus Regional Healthcare System purchased the Treatment Center for $10.5 million. After the purchase, Dr. Tidwell continued to treat patients at the Treatment Center, and Mrs. Tidwell continued to work at the Treatment Center. Barker contends that Columbus Regional paid more than the fair market value for the Treatment Center so that Columbus Regional would receive referrals from Dr. Tidwell and so that Dr. Tidwell's patients would not be referred to Columbus Regional's competitors. *See* Tidwell Dep. 46:16-47:5, ECF No. 85 (explaining that Mrs. Tidwell told Columbus Regional it would "lose a hell of a lot of money if they didn't buy" the Treatment Center because if Columbus Regional's competitor bought or opened its own cancer center, any patient referrals would be to the competitor and not to Columbus Regional).

The Tidwells assert that they believed that $10.5 million was a reasonable price for the Treatment Center. In support of

5

this position, the Tidwells point out that their accountant advised them in 2009 not to sell the Treatment Center for less than $12 million, and in 2010 another free-standing radiation oncology clinic in Georgia sold for $18 million.  Tidwell Decl. ¶ 15.  But there is also evidence that the Treatment Center was not worth $10.5 million in 2010.  It is undisputed that a valuation firm placed the "high end" value of the Treatment Center at $10 million.  *See also* Tidwell Dep. 45:16-19 ("I wouldn't do anything with the Medical Center for less than 500,000 more than whatever our appraisal is because they have been such pains in our asses for so many years.").  In addition, Barker pointed to evidence that the Treatment Center's equipment was out of date and needed to be replaced.  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 10, Mem. from Jake A. Jones III to Donald E. Elder (June 24, 2010), ECF No. 95-11.

## DISCUSSION

The False Claims Act and the Georgia Medicaid False Claims Act prohibit fraud against government programs.  Both statutes impose liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A); *accord* O.C.G.A. § 49-4-168.1.  Under both statutes, the term "knowingly" means that "a person, with respect to information--(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the

truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A); *accord* O.C.G.A. § 49-4-168(2). Tidwell argues that he did not *knowingly* submit any false claims.

**I.   IMRT Billing**

Dr. Tidwell contends that the present record establishes that he did not knowingly submit false claims in connection with his IMRT billings *as a matter of law*. It is undisputed that the Treatment Center billed Medicare and Medicaid for IMRT based on treatment provided to patients using the DynART system. If a jury believes Dr. Tidwell, then it could certainly find that he reasonably believed that the treatment he provided to patients using the DynART system satisfied the requirements for billing IMRT under Medicare. But if the jury does not believe him, there is other evidence that could support a finding that the DynART system did not provide IMRT and the Tidwells knew it. Because this is the type of factual dispute that must be resolved by a jury and not the judge, Dr. Tidwell is not entitled to summary judgment on this claim.

**II.   Sale of Tidwell Cancer Treatment Center**

Barker contends that the sale of the Treatment Center violated the Anti-Kickback Statute. A violation of the Anti-Kickback Statute can form the basis of a False Claims Act action if compliance with the Anti-Kickback Statute is "necessary for

7

reimbursement" of a claim and the claimant submits the claim for reimbursement knowing that the claimant was ineligible for the payment due to a violation of the Anti-Kickback Statute. *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-60 (11th Cir. 2005); *accord* 42 U.S.C. § 1320a-7b(g).

Dr. Tidwell does not dispute that compliance with the Anti-Kickback Statute is necessary for reimbursement of Medicare and Medicaid claims. *See* 42 U.S.C. § 1320a-7b(g) (stating that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of" the False Claims Act). Rather, he argues that he did not *knowingly* violate the Anti-Kickback Statute.

The Anti-Kickback Statute forbids the solicitation or receipt of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" in return for referring Medicaid or Medicare patients for services. 42 U.S.C. § 1320a-7b(b)(1)(A). In other words, a doctor may not receive any compensation for referring Medicare or Medicaid patients to a hospital. To establish a violation of the Anti-Kickback Statute, Barker must show that Dr. Tidwell knowingly and willfully solicited or received money in return for giving Columbus Regional Medicare and Medicaid referrals. *Id.*

Dr. Tidwell does not appear to dispute that a purpose of Columbus Regional's purchase of the Treatment Center was to ensure that Dr. Tidwell referred his patients to Columbus Regional. Dr. Tidwell also does not dispute that an overpayment for assets or services may be an illegal kickback if a purpose of the transaction is to induce referrals; the difference between the amount paid and the actual value of the asset or service is the illegal kickback. *Cf., e.g., United States v. Lipkis*, 770 F.2d 1447, 1449 (9th Cir. 1985) (describing a kickback arrangement where a laboratory paid more than fair market value for services provided by a medical group, so the court inferred that the laboratory was also paying for lab work referrals). Dr. Tidwell, however, argues that Columbus Regional paid fair market value, nothing more, for the Treatment Center.

If a jury finds that Dr. Tidwell reasonably believed that the Treatment Center was worth at least $10.5 million, then it would be authorized to conclude that he did not violate the Anti-Kickback Statute. But if the jury concluded that he believed that the Treatment Center was worth less than what he received based on other evidence, including a valuation firm's "high end" value that was $500,000 below the purchase price, the jury would be authorized to conclude that the amount paid in excess of fair market value was a kickback for referrals. That factual finding would support a conclusion that Dr. Tidwell

9

violated the Anti-Kickback Statute. This genuine factual dispute must be resolved by a jury and not the judge.

**III. Referrals Following the Sale of the Treatment Center**

The Stark Law prohibits physicians from referring Medicare patients to an entity for clinical laboratory services if the physician has a prohibited financial relationship with the entity. 42 U.S.C. § 1395nn(a)(1). The Stark Law also forbids physicians from submitting Medicare claims for services furnished pursuant to a prohibited referral. *Id.* § 1395nn(a)(1)(B); *accord id.* § 1395nn(g)(1) ("No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section.") But, "a request by a radiation oncologist for radiation therapy, if such services are furnished by (or under the supervision of) such pathologist, radiologist, or radiation oncologist pursuant to a consultation requested by another physician does not constitute a 'referral' by a 'referring physician'." 42 U.S.C. § 1395nn(h)(5)(C); *accord* 42 C.F.R. § 411.351 (defining "consultation").

To be a permitted consultation rather than a prohibited referral under the Stark Law, the doctor's "opinion or advice regarding evaluation or management or both of a specific medical problem" must be "requested by another physician." 42 C.F.R. § 411.351 "The request and need for the consultation

10

are documented in the patient's medical record." *Id.* "After the consultation is provided," the radiation oncologist must prepare "a written report of his or her findings, which is provided to the physician who requested the consultation." *Id.* And the radiation oncologist must communicate "with the referring physician on a regular basis about the patient's course of treatment and progress." *Id.*

Dr. Tidwell submitted evidence that after Columbus Regional purchased the Treatment Center, Dr. Tidwell saw patients at the Treatment Center "in consultation at the request of and referral from other physicians." Tidwell Decl. ¶ 12. The Treatment Center's "regular practice and procedure" was for Dr. Tidwell "to prepare an initial 'consultation note' after the patient's initial visit, which note included the reason for the consultation as well as Dr. Tidwell's findings." *Id.* After that, Dr. Tidwell prepared weekly radiation treatment management notes "summarizing the treatment provided to the patient during that week and the patient's progress." *Id.* And those management notes were routinely sent to the referring physicians. *Id.* If Dr. Tidwell's evidence is admissible and not contradicted, then there would be no legal basis supporting a claim based on a violation of the Stark Law.

Dr. Tidwell's evidence on this point is the declaration of Mrs. Tidwell, who testified about the routine practices and

11

procedures of Dr. Tidwell and the Treatment Center. Barker contends that Mrs. Tidwell's declaration includes inadmissible opinion testimony that the Court may not consider. The Court disagrees. Mrs. Tidwell's declaration states facts about the routine practices and procedures of Dr. Tidwell and the Treatment Center. Mrs. Tidwell asserts that such facts are within her personal knowledge as manager of the Treatment Center. Mrs. Tidwell does not offer any opinion on whether the routine practices and procedures of the Treatment Center complied with the Stark Law. The Court thus finds that her declaration may be considered.

Barker failed to point to any evidence to create a genuine fact dispute on the Treatment Center's consultation practices. Barker directed the Court to no evidence to refute Mrs. Tidwell's testimony that Dr. Tidwell's opinion and advice were requested by other physicians. He pointed to no evidence to refute Mrs. Tidwell's testimony that Dr. Tidwell documented the request and need for the consultation in the patient's medical record. He pointed to no evidence to refute Mrs. Tidwell's testimony that Dr. Tidwell prepared written reports of his findings and regularly communicated with the referring physicians about the patients' course of treatment and progress. Because Barker did not point to *any* evidence to create a genuine

12

fact dispute on this point, Dr. Tidwell is entitled to summary judgment on Barker's Stark Law claim.[2]

CONCLUSION

As discussed above, Dr. Tidwell's summary judgment motion (ECF No. 80) is granted as to Barker's claim based on violations of the Stark Law but denied as to Barker's claims based on the IMRT billings and the Anti-Kickback Statute.

IT IS SO ORDERED, this 3rd day of June, 2015.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[2] Barker suggests that Dr. Tidwell may not prevail as a matter of law unless he presents expert testimony that his practices complied with the Stark Law. Given that Barker presented absolutely no evidence to suggest that Dr. Tidwell did not adequately consult and communicate with referring physicians, the Court finds that expert testimony is unnecessary.