IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* RICHARD BARKER, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| vs. | | CASE NOS. 4:12-CV-108 (CDL) |
| | * | 4:14-CV-304 (CDL) |
| COLUMBUS REGIONAL HEALTHCARE SYSTEM, *et al.*, | * | |
| Defendants. | * | |

O R D E R

Relator Richard Barker brought two *qui tam* actions in this Court alleging that Defendant Columbus Regional Healthcare System violated the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and the Georgia Medicaid False Claims Act, O.C.G.A. §§ 49-4-168 to 168.6.  Columbus Regional reached an agreement with the United States and Georgia to settle both actions for $25 million, plus a possible contingent payment in the future.  It is undisputed that Barker is entitled to a share of the proceeds, but the parties cannot agree on how much.  Barker contends that he is entitled to $6,737,625.00 plus interest.  The United States and Georgia argue that Barker is entitled to $4,524,750.00 plus interest.  As discussed below, the Court finds that Barker is entitled to $5,337,000.00 plus pro rata interest.

DISCUSSION

A *qui tam* plaintiff is entitled to a share of the proceeds of his *qui tam* action. 31 U.S.C. § 3730(d). If the Government intervenes in a *qui tam* action, the *qui tam* plaintiff "shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." *Id.* § 3730(d)(1). If the Government does not intervene, the *qui tam* plaintiff is entitled to receive an amount "not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement." *Id.* § 3730(d)(2). The parties agree that Barker is entitled to a share of the settlement proceeds, plus interest. But the parties dispute (1) how much of the settlement proceeds should be attributed to each *qui tam* action and (2) what percentage Barker should recover for his contribution to each action. The Court addresses each issue in turn.

I. **Amount of Damages Attributable to *Barker I* and *Barker II***

In the first action, *Barker I*, Barker alleged that (1) certain Columbus Regional oncologists improperly billed government payors for evaluation and management services, (2) an oncologist at the Tidwell Cancer Treatment Center improperly billed government payors for intensity modulated radiation

2

therapy, (3) Columbus Regional overpaid for its purchase of the Tidwell Cancer Treatment Center as a kickback for referrals, and (4) Columbus Regional's relationship with a physician group called Radiation Oncology of Columbus violated the Stark Law.[1] In the second action, *Barker II*, Barker alleged that Columbus Regional's compensation agreement with Dr. Andrew Pippas violated the Stark Law. The United States and Georgia intervened in *Barker II* but not *Barker I.*

The parties agree that Columbus Regional settled all claims against it in both of Barker's actions for $25 million, plus a possible contingent payment in the future. The parties also agree that the $25 million amount was reached based on Columbus Regional's ability to pay and does not represent the full value of the claims. Barker seeks to recover a share of the $25 million, plus a proportional share of any future payment. Barker contends that fifty percent of the settlement amount is attributable to *Barker I* and that fifty percent is attributable to *Barker II.* The United States and Georgia argue that 8.1% of the settlement is attributable to *Barker I*, while 91.9% is

---

[1] Barker also alleged in *Barker I* that Columbus Regional's relationship with Dr. Thomas J. Tidwell violated the Stark Law. Dr. Tidwell moved for summary judgment on this issue, arguing that his practices fell within the Stark Law's radiation oncologist carve-out, 42 U.S.C. § 1395nn(h)(5)(C). The Court granted Dr. Tidwell's motion on this claim because "Dr. Tidwell presented evidence that his services were provided pursuant to a consultation exception to the Stark Law, and Barker did not present any evidence to create a genuine fact dispute on this point." *U.S. ex rel. Barker v. Tidwell*, No. 4:12-CV-108(CDL), 2015 WL 3505554, at *1, *5 (M.D. Ga. June 3, 2015).

3

attributable to *Barker II*.  Barker accuses the United States and Georgia of manipulating the numbers to reduce Barker's share. The Court finds no such manipulation.

### A. Valuation of *Barker II*

For the most part, the parties agree on a figure for the valuation of the claims asserted in *Barker II*.  An auditor for the United States calculated that the potential Medicare losses associated with *Barker II* were $44.37 million, and an auditor for Georgia calculated that the potential Medicaid losses associated with *Barker II* were $3.44 million.[2]  Oberembt Decl. ¶ 41, ECF No. 119-2 in 4:12-cv-108.  Therefore, the potential losses associated with *Barker II* total $47.81 million.

### B. Valuation of *Barker I*

The parties do not agree on a figure for the valuation of the claims asserted in *Barker I*.  The parties' main dispute is

---

[2] Barker asserts in a footnote that the $44.37 million should be reduced by an unspecified amount to the extent that it includes radiation therapy referrals by Dr. Andrew Pippas.  Barker contends that he raised this claim in *Barker I*.  But Barker's Stark Law claims in *Barker I* focused on the Columbus Regional's relationship with Dr. Tidwell and Radiation Oncology physicians, not Dr. Pippas.  *Compare* Am. Compl. ¶¶ 109-123, ECF No. 10 in 4:12-cv-108 (alleging Stark Law violations based on Columbus Regional's relationships with Radiation Oncology physicians and Dr. Tidwell), *with id.* ¶¶ 28-86 (alleging upcoding violations by Dr. Pippas and others); *see also* Oberembt Decl. ¶¶ 6, 14, 16 (noting that when Barker's counsel presented Barker's claims during settlement discussions in November 2014, she listed two "current" Stark Law claims based on Columbus Regional's relationships with Radiation Oncology physicians and Dr. Tidwell and that she listed one "new" Stark Law claim related to Dr. Pippas's referrals, for which Barker intended to file a second action).  In summary, based on the record before the Court, all of the Stark Law claims related to Dr. Pippas are appropriately categorized as *Barker II* claims.

4

the amount of the settlement attributable to the *Barker I* Stark Law claim based on Columbus Regional's relationship with a physician group called Radiation Oncology of Columbus. To a lesser extent, the parties dispute the amount attributable to the other *Barker I* claims.

   *1.   Radiation Oncology of Columbus Stark Law Claim*

Barker contends that the *Barker I* Stark Law claim arising out of Columbus Regional's relationship with Radiation Oncology physicians is worth $24.8 million. That amount is based on technical charges arising out of radiation therapy treatments performed by Radiation Oncology physicians at Columbus Regional's John B. Amos Cancer Center. Bennett Aff. ¶ 61, ECF No. 116-2 in 4:12-cv-108. The United States values this claim at $0 because it concluded that Columbus Regional would likely be able to establish that the referrals from Radiation Oncology physicians are not "referrals" within the meaning of the Stark Law. The United States believes that these "referrals" fall within the Stark Law's radiation oncologist consultation exception, just as Dr. Tidwell's did. *See supra* note 1.

The parties submitted dueling declarations regarding the viability of this Stark Law claim. Barker also submitted, as an attachment to his reply brief, a summary judgment motion his attorney drafted on this point but did not file (without the statement of undisputed material facts or underlying evidence).

5

But the Court cannot speculate about what the record might have been if it had been developed through summary judgment briefing, and the Court's present task is not to decide a summary judgment motion. The Court's current job is to determine whether the United States reasonably concluded that the Radiation Oncology Stark Law claim had no value. The dueling declarations are the only evidence from which the Court can decide this issue.

On one hand, the United States received an expert report from an accountant suggesting that the radiation oncologist carve-out applied. The accountant reviewed a sample of medical records for patients who received radiation therapy at the Amos Center and concluded that 100% of the records complied with the Stark Law's consultation requirements, putting those referrals within the Stark Law's radiation oncologist consultation exception. Oberembt Decl. ¶ 19. Also, Barker's counsel concluded at one point that while this issue was "in doubt," it was unlikely to "have much traction with either Judge Land or a jury in a fraud case and [Barker did] not intend to pursue this further." Oberembt Decl. Attach. 2B, Letter from Jamie Bennett to Laurie Oberembt, *et al.* (Jan. 7, 2015), ECF No. 119-4 in 4:12-cv-108. On the other hand, Barker's counsel later revisited the issue, reviewed Columbus Regional's records more closely, and concluded that the records did not comply with the Stark Law's "regular[] communicat[ion]" consultation

6

requirements. Bennett Aff. ¶ 40; Bennett Suppl. Aff. ¶ 7, ECF No. 121-1 in 4:12-cv-108.

The Court finds that the United States reasonably concluded that the Radiation Oncology Stark Law claim was very weak. The Government determined that Columbus Regional had a sound argument that the radiation oncologist carve-out applied because an expert concluded that 100% of the sampled records complied with the Stark Law's consultation requirements. Even if Barker presented expert evidence that Columbus Regional's expert was wrong, there would still be a fact question on whether the carve-out applied and thus whether there were "referrals" within the meaning of the Stark Law. And even if there *were* referrals within the meaning of the Stark Law, Columbus Regional could still make a case that the referrals were proper based on another statutory or regulatory exception. For all of these reasons, the Court is not convinced that the United States attempted to manipulate the numbers by concluding that it was unlikely to prevail on the Radiation Oncology Stark Law claim. Rather, the Court finds that the United States took a realistic view in valuing the claim at $0.

    2.    *Evaluation and Management Services Upcoding Claim*

Barker contends that certain Columbus Regional oncologists improperly billed government payors for evaluation and management services. His expert calculated that this claim is

7

worth $3,467,509.00. Bennett Aff. ¶ 63. The United States values this claim at $2,830,994.00 based on information from (1) Barker's expert's report, (2) Columbus Regional's expert's report, and (3) additional information from Columbus Regional. Oberembt Decl. ¶ 51. Based on that information, the United States discovered that Barker's expert had made several mistakes in calculating the value of this claim. The Court finds that the United States reasonably concluded that the evaluation and management services upcoding claim is worth $2,830,994.00.

    *3. IMRT Billing Claim*

Barker contends that an oncologist at the Tidwell Cancer Treatment Center improperly billed government payors for intensity modulated radiation therapy even though he did not provide that therapy. Barker did not assign a value to this claim. Based on information it received from Columbus Regional, the United States values the claim at $868,270.00. The Court has no reason to doubt that this is a reasonable valuation of this claim.

    *4. Tidwell Center Purchase Claim*

Barker asserts that Columbus Regional overpaid for its purchase of the Tidwell Cancer Treatment Center and that this purchase violated the Anti-Kickback Statute. Columbus Regional paid $10.5 million for the Tidwell Center even though "a valuation firm placed the 'high end' value of the [Tidwell]

8

Center at $10 million." *Tidwell*, 2015 WL 3505554, at *2. Barker values the claim at $2,297,330.00, which is the amount of claims Columbus Regional submitted to Medicare for treatments at the Tidwell Center after the purchase. Bennett Aff. ¶ 63. The United States, on the other hand, values the claim at $500,000.00, which is the difference between the "high end" fair market value of the Tidwell Center and the price Columbus Regional paid for it. Oberembt Decl. ¶ 53. In other words, the United States contends that this claim is worth the amount of the alleged kickback.

Neither side pointed the Court to any authority regarding how much the Government may recover for a False Claims Act claim based on violations of the Anti-Kickback Statute. But the False Claims Act's civil penalties are based on "the amount of damages which the Government sustains because of" the false claim. 31 U.S.C. § 3729(a)(1). Here, according to Barker, Columbus Regional submitted claims for $2,297,330.00 that were based on improper Medicare and Medicaid referrals. Thus, the Court finds that it is reasonable to value this claim at $2,297,330.00.

    *5.   Summary of* Barker I *Valuation*

In summary, the Court finds that the potential losses associated with *Barker I* are $6 million: $2,830,994.00 million for the evaluation and management services upcoding claim,

9

$868,270.00 for the IMRT billing claim, and $2,297,330.00 for the Tidwell Center purchase.

### C. Valuation Summary

For the reasons discussed above, the Court concludes that the potential losses associated with *Barker I* were $6 million, and the potential losses associated with *Barker II* were $47.81 million. Based on these numbers, the Court finds that 11.2% ($2.8 million) of the $25 million Columbus Regional settlement should be attributed to *Barker I* and that 88.8% ($22.2 million) should be attributed to *Barker II*. Should there be any future payments by Columbus Regional under the settlement agreement, these percentages should be used to calculate Barker's share.

Barker also seeks to recover a share of the $425,000.00 payment made by Dr. Andrew Pippas to resolve the claims asserted against him in *Barker II*. In his calculations, Barker allocated fifty percent of that payment to *Barker I*, with no explanation of why he did so. Dr. Pippas was only a Defendant in *Barker II*, so it is not clear why any of the proceeds he paid to resolve *Barker II* should be allocated to *Barker I*. The Court finds that all of the $425,000 payment should be attributed to *Barker II* and that none of it should be attributed to *Barker I*.

## II. Percentage Barker Shall Recover

The next question is what percentage Barker should recover of the $2,787,585.95 settlement proceeds attributable to *Barker*

10

*I* and the $22,637,414.05 settlement proceeds (including the $425,000 payment from Dr. Pippas) attributable to *Barker II*. Barker is entitled to receive "not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement" attributable to *Barker I*, the action where neither the United States nor Georgia intervened. 31 U.S.C. § 3730(d)(2). For *Barker II*, he is entitled to "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which [he] substantially contributed to the prosecution of the action." *Id.* § 3730(d)(1). Barker seeks an award of twenty-nine percent of the settlement proceeds attributable to *Barker I* and twenty-four percent attributable to *Barker II*. The United States and Georgia argue for an award of twenty-seven percent for *Barker I* and seventeen percent for *Barker II*.

The parties agree "that determination of the relator's share is left largely to the Court's informed discretion." *U.S. ex rel. Alderson v. Quorum Health Grp., Inc.*, 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001). To inform their discretion, courts generally have considered the following factors in determining the relator's share:

1. The significance of the information provided to the government by the *qui tam* plaintiff;

2. The contribution of the *qui tam* plaintiff to the result; and

    3.    Whether the information in the suit provided by the relator was previously known to the government.

*Id.* at 1332 (citing S. Rep. No. 99-345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5293).  Courts have also considered Justice Department guidelines in assessing a relator's contribution.  *Id.* at 1333-34.  Under those guidelines, factors militating toward a higher relator percentage include:

    1.    The relator reported the fraud promptly.

    2.    When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the Government.

    3.    The *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices.

    4.    The complaint warned the Government of a significant safety issue.

    5.    The complaint exposed a nationwide practice.

    6.    The relator provided extensive, first-hand details of the fraud to the Government.

    7.    The Government had no knowledge of the fraud.

    8.    The relator provided substantial assistance during the investigation and/or pre-trial phases of the case.

    9.    At his deposition and/or trial, the relator was an excellent, credible witness.

    10.    The relator's counsel provided substantial assistance to the Government.

    11.    The relator and his counsel supported and cooperated with the Government during the entire proceeding.

    12.    The case went to trial.

13. The FCA recovery was relatively small.

14. The filing of the complaint had a substantial adverse impact on the relator.

*Id.* at 1333-34.  Factors counseling a lower percentage include:

1. The relator participated in the fraud.

2. The relator substantially delayed in reporting the fraud or filing the complaint.

3. The relator, or relator's counsel, violated FCA procedures:

    a. complaint served on defendant or not filed under seal.

    b. the relator publicized the case while it was under seal.

    c. statement of material facts and evidence not provided.

4. The relator had little knowledge of the fraud or only suspicions.

5. The relator's knowledge was based primarily on public information.

6. The relator learned of the fraud in the course of his Government employment.

7. The Government already knew of the fraud.

8. The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Governments' position in litigation.

9. The case required a substantial effort by the Government to develop the facts to win the lawsuit.

10. The case settled shortly after the complaint was filed or with little need for discovery.

11. The FCA recovery was relatively large.

13

*Id.* at 1334.

Here, the United States and Georgia acknowledge that Barker promptly reported the issues in *Barker I* when the government had no knowledge of them, that he tried to report the issues internally and encourage Columbus Regional to self-report them, that his *qui tam* action caused Columbus Regional to change its practices, that he provided the Government with first-hand details of Columbus Regional's upcoding issues, and that he and his counsel litigated the case on their own for some time. In addition, the United States and Georgia do not seriously dispute that *Barker I* had a substantial adverse impact on Barker. Soon after the *qui tam* action was unsealed, Barker lost his job as administrative director of the John B. Amos Cancer Center, and he has not been able to find another job in the field despite nearly thirty years of experience managing cancer treatment centers. For all of these reasons, the Court finds that Barker is entitled to twenty-nine percent of the proceeds from *Barker I*, $812,000.00.

During discovery in *Barker I*, Barker and his counsel received documents from Columbus Regional that formed the basis for their claims in *Barker II*. Around the same time (or soon after), Columbus Regional and the United States began discussing settlement of *Barker I*. During November 2014, Barker's counsel told the United States that she had identified additional

potential Stark Law claims related to Dr. Pippas. The United States immediately started investigating these claims and also began investigating Columbus Regional's ability to pay. By April 3, 2015, the parties had reached an agreement to settle both *Barker I* and *Barker II*.

It is not seriously disputed that Barker's efforts in *Barker I* led to the discovery of the facts underlying *Barker II*. But Barker's contribution to *Barker II* was more limited than his contribution in *Barker I*. He had little first-hand knowledge of the potential Stark Law issues involving Dr. Pippas, and he and his counsel were not asked to do any work in connection with *Barker II*. For all of these reasons, the Court finds that Barker is not entitled to a share near the maximum of twenty-five percent. Rather, the Court finds that Barker shall recover twenty percent of the proceeds from *Barker II*, $4,525,000.00.

## CONCLUSION

For the reasons set forth above, the Court finds that Barker is entitled to a share of the settlement proceeds in the total amount of $5,337,000.00 ($812,000.00 for *Barker I* and $4,525,000.00 for *Barker II*) plus pro rata interest. Should there be any future payments by Columbus Regional under the settlement agreement, the percentages set forth in this Order should be used to calculate Barker's share. Both *Barker I* and

15

*Barker II* shall be dismissed pursuant to the settlement and today's Order.

IT IS SO ORDERED, this 28th day of March, 2016.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA